GULF COMPRESS CO., *v.* INSURANCE CO. OF PENNSYL-
VANIA. *

GULF COMPRESS CO. *v.* COMMERCIAL UNION ASSUR-
ANCE CO. *

GULF COMPRESS CO. *v.* STUYVESANT INSURANCE CO.*

(*Jackson.*   April Term, 1914.)

1. APPEAL AND ERROR.   Harmless error.   Submission of un-
necessary issues.

Where, in an action on a fire policy, the issue was the amount
of the loss, the action of the court in submitting the issue of
insurer's good faith in refusing to pay the loss was not preju-
dicial to insurer, especially as the question of good faith was
found in favor of the defendant.   (*Post, p.* 590.)

2. INSURANCE.   Fire insurance.   Confession of liability.

An insurer, agreeing to an arbitration to ascertain the amount
of a loss, thereby confesses its liability on the policy, and it
cannot escape from the admission by subsequently violating
the arbitration agreement, or by withdrawing from the arbitra-
tion.   (*Post, pp.* 590-594.)

3. APPEAL AND ERROR.   Harmless error.   Instructions.

Where, in an action a fire policy stipulating that it should be void
if insured concealed any material fact, or in case of any fraud
touching any matter relating to the insurance before or after
a loss, it appeared that insurer agreed to arbitration, but sub-
sequently withdrew therefrom, whereupon insured brought the
action on the policy, the refusal to charge that insurer could
withdraw from the arbitration whenever it saw fit to do so
without giving any reason therefor, which withdrawal did not
prejudice its rights under the policy either to contest the

*On the question of arbitration as condition precedent to action on
insurance policy, see note in 15 L. R. A. (N. S.), 1055.

The question of the law governing as to extent of recovery on policy
is discussed in a note in 63 L. R. A. (N. S.), 868.

amount of the loss or to question the good faith of insured in making proof of loss, was not prejudicial to the insurer, where it was allowed to introduce such evidence as it had on the question of the good faith of insured in making proof of loss and submitting the issue to the jury. (*Post, pp.* 590-594.)

Cases cited and approved: St. Paul Fire & Marine Insurance Co. v. Kirkpatrick, 129 Tenn., ——; Hickerson v. Insurance Companies, 96 Tenn., 193; North German Insurance Co. v. Morton-Scott-Robertson Co., 108 Tenn., 384.

4. **TRIAL. Instructions. Laying stress on evidence.**
   A requested instruction, which lays stress on a special item of evidence, is properly refused. (*Post, pp.* 594-596.)

5. **TRIAL. Instructions. Assumption of fact.**
   A requested instruction, which assumes a fact not shown by the evidence, is properly refused. (*Post, pp.* 596, 597.)

6. **APPEAL AND ERROR. Harmless error. Admission of evidence.**
   Where, in an action on a fire policy, there was no evidence that insured had knowingly made a false statement of the value of the property destroyed, except in so far as the proof related to his supposed knowledge of another machine of substantially the kind destroyed by fire, but there was no evidence that he had any such knowledge at the time of making the proof, the error in permitting complainant to testify that insurer did not, up to the filing of its crossbill, state to him that a knowingly false proof of loss had been made to defraud insurer, was not prejudicial to insurer, and must be disregarded, as required by Acts 1911, ch. 32. (*Post, p.* 597.)

7. **APPEAL AND ERROR. Harmless error. Erroneous rulings.**
   In an action on a fire policy against an insurer which had confessed liability, an issue whether insured furnished fraudulent proof of loss was immaterial, and rulings on the issue were not prejudicial. (*Post, p.* 598.)

8. **APPEAL AND ERROR. Verdict. Conclusiveness.**
   A verdict sustained by any evidence cannot be disturbed by the court on appeal. (*Post, p.* 598.)

Compress Co. v. Insurance Co.

9. INSURANCE. Fire insurance. Loss. Liability.

Where insurer refused to replace machinery destroyed by fire with another plant, which could then have been obtained cheap, or to furnish the money to buy it, it could not insist that the loss by the fire should be measured by the cost of the plant is refused to buy. (*Post, pp.* 598-601.)

10. INSURANCE. Fire insurance. Total loss. "Cash value."

Where there was a total loss of property covered by a fire policy, and the property included a machine which insured purchased for $11,500 at a sacrifice sale, and which was as good as new at the time of the loss, and the machine was insured for $15,000, and insurer failed to settle by procuring an equally good machine for $15,000 several months after the fire, and there was no evidence that the latter machine could have been procured at that price at any earlier or later date, or any other machine of the kind for that price, insured could recover the actual cash value of the property destroyed; "cash value" meaning what it would cost to reproduce it in the same condition as before the fire. (*Post, pp.* 601-607.)

Cases cited and approved: McCready v. Hartford Insurance Co., 61 App. Div., 584, 585; Standard Sewing Machine Co. v. Royal Insurance Co., 201 Pa., 645; Everett v. Insurance Co. (Tex. Civ. App.), 36 S. W., 125; Frick v. Insurance Co., 218 Pa., 409; Mechanics' Insurance Co. v. C. A. Hoover Distilling Co., 182 Fed., 590.

---

FROM SHELBY.

---

Appeal from Chancery Court, Shelby County.— F. H. HEISKELL, Chancellor.

R. LEE BARTELS, for appellants.

G. T. FITZHUGH, for appellee.

MR. CHIEF JUSTICE NEIL delivered the opinion of the Court.

The bill in this case was filed at Memphis, Tenn., to recover on four several policies of insurance executed on the plant of the complainant, located in Argenta, Ark. The complainant corporation is domesticated in Tennessee. A judgment was rendered in complainant's favor on all the policies, and the defendants have appealed to this court, and assigned errors, fourteen in number.

A jury was demanded, and issues were framed for their consideration in the trial court. There were seven of these. They were in the form of questions. In No. 1 the jury was asked to state the amount of damages which the fire had caused to complainant's compress machine and boilers, and answered: "$34,492.-80." No. 2 the amount of damages to the other property of the complainant. They answered: "$37,833.-15." Nos. 3, 4, and 5 presented the question in various aspects as to whether the insurance companies, in refusing to pay the loss, had acted in bad faith. To this the jury responded: "No." The sixth and seventh issues asked the question whether complainant, or its receiver, furnished the insurance companies proofs of loss which were false or fraudulent, and knowingly so, and whether they knowingly made an exaggerated and false claim against the companies. The jury answered these two quesions: "No."

The various assignments of error arrange themselves around the several issues mentioned, and they will be considered in relation thereto, rather than in the order in which they appear in the briefs of counsel.

It is most convenient to first dispose of those bearing solely upon the third, fourth, and fifth issues, concerning the good faith of the defendant companies.

Assignments Nos. 4, 5, 8, 9, and 10 bear solely on the question of good faith presented by these issues. They seem to us wholly immaterial, in view of the fact that the response of the jury on these issues was favorable to the defendants. It matters not, therefore, whether the action of the chancellor in respect of the matters covered by these assignments was correct or incorrect, inasmuch as no injury was caused the defendants by his action in respect of any of them. It is insisted, however, in behalf of the defendants, that the chancellor's rulings upon these various points prejudiced the defendants generally before the jury. In the view we take of the case the chief matters before us are the questions arising under issues Nos. 1 and 2, and the assignments based on them. We are unable to see how the rulings of the chancellor on the other question could prejudice the defendants on the subject of value, with which issue Nos. 1 and 2 are wholly concerned.

Assignments Nos. 3, 11, and 12 bear solely upon the matters covered by issues Nos. 6 and 7, concerning the good faith of the complainant.

Before setting out the contents of assignment No. 3, it is proper to quote the exact language of issue No.

6, and state certain facts bearing thereon, and certain points in the pleadings in respect thereof.

Issue No. 6 reads:

"Did the Gulf Compress Company, or its receiver, C. C. Hanson, furnish to the defendant insurance companies proofs of loss which were false or fraudulent, and knowingly so, and did it (or he) knowingly make an exaggerated and false claim against the insurance companies?"

The defendants filed a cross bill, in which they charged the substance embraced in this issue, and this was denied by the complainant, and an issue was framed thereon as above. However, it appeared as an undisputed matter in the evidence that, after complainants had filed their proofs of loss, it called on the defendants to go into an appraisement or arbitration with it, pursuant to the terms of the respective policies on that subject. This was agreed to, and arbitrators were selected. Subsequently, a dispute having arisen over the selection of an umpire, the defendants receded from the arbitration, and notified the complainants they would proceed no further in that matter. Thereupon the original bill was filed.

The arbitration clause in one of the policies, which is in substance the same in all, reads:

"In the event of disagreement as to the amount of loss, the same shall, as above provided, be ascertained by two competent and disinterested appraisers, the insured and this company each selecting one, and the two so chosen shall first select a competent and

disinterested umpire; the appraisers together shall then estimate and appraise the loss, stating separately, sound value and damage, and, failing to agree, shall submit their differences to the umpire; and the award in writing of any two shall determine the amount of such loss. The parties thereto shall pay the appraiser respectively selected by them, and shall bear equally the expense of the appraisal and umpire.''

Assignment No. 3 makes the point that the chancellor committed error in refusing to charge the following special instruction which the defendant's counsel asked him to give to the jury:

''The insurance companies had a right, as a matter of law, to withdraw from the appraisal or arbitration agreement whenever they saw fit to do so, without giving any reason whatever therefor; and this withdrawal could in no way prejudice their rights under the policies, either to contest the amount of the loss, or to question the good faith of the insured in making the proofs of loss, or to make the claim that they did not truly and correctly represent the amount of the loss.''

This instruction would have misled the jury. When the defendants agreed to an arbitration, they thereby confessed their liability on the policies just as fully as if they themselves had proposed the arbitration, and it had been accepted by the insured, the complainants. That the demand of an appraisal is an admission of liability has been fully settled in this State. *St. Paul Fire & Marine Insurance Co.* v. *Kirkpatrick,* 129 Tenn.,—, 164 S. W., 1186; *Hickerson* v. *Insurance*

*Companies,* 96 Tenn., 193, 199, 200, 33 S. W., 1041, 32
L. R. A., 172; *North German Insurance Co.* v. *Morton-Scott-Robertson Co.,* 108 Tenn., 384, 390, 67 S. W., 816.
having thus admitted liability, the insurer could not
escape from the admission by subsequently violating
the arbitration agreement.    Upon such recession the
insurer has the right to a trial in court for the purpose
of ascertaining the amount of the damage, but not to
question the liability.    The fundamental basis of an
agreement to arbitrate the amount of damages is nec-
essarily a confession that there is such liability.    It
is as much a confession as if an admission of liability
were in terms made in the agreement for arbitration.
The rule is likewise based on the proposition of law
that one cannot be permitted to maintain at the same
time two inconsistent contentions.    Conduct of this
kind is indicative of fraud, or oppression, or both.    To
sanction it would be contrary to public policy and
sound morals.    The case is different, of course, where,
before going into an appraisement or estimate, there is
an agreement that neither party shall be bound by the
result; the understanding  being that the effort is to
be made only with a view to a contemplated settlement.
But to hold that the insurer can compel the insured to
go into an arbitration on pain of the forfeiture of the
policy for refusal, and at the same time incur no risk
either by acceptance or refusal, or by withdrawing af-
ter it has once agreed, is to destroy the mutuality in
the contract as to this special feature, and authorize
the companies to pursue an unfair course of conduct

129 Tenn. 38

towards the unfortunate victim of a fire loss. It is to
sanction the unjust conduct of professional adjusters,
who too often commend themselves to the good graces
of the insurer by browbeating the distressed insured,
and thereby forcing him to make ruinous concessions.
While it is true that a single consideration, as, for ex-
ample, the promise to pay on the happening of a loss
may support many promises on the other side, and
while it is likewise true that the insurance may be lim-
ited by conditions, yet it is furthermore true that when
a loss has occurred, and the contract has become con-
summate, and the question is simply upon the method
of ascertaining the amount to be paid, the way is open
for the application of considerations based on public
policy, and it is within the power of the court to refuse
to enforce any stipulation which it regards as viola-
tive of those considerations. We have had occasion to
point out in a recent opinion some of the abuses of
the appraisement, or arbitration clause, in its prac-
ticable operation. *St. Paul Fire & Marine Insurance
Co.* v. *Kirkpatrick,* supra.

However, regardless of the rule just stated, the
chancellor permitted the defendants to not only con-
test the amount of the loss, but to question the good
faith of the insured in making the proofs of loss, with
a view to enabling the defendants to take advantage
of a clause in a policy as follows:

"This entire policy shall be void if the insured has
concealed or misrepresented in writing or otherwise
any material fact or circumstance concerning this in-

surance, or the subject thereof,  . . .  or in case of any fraud or false swearing by the insured touching any matter relating to this insurance, or the subject thereof, whether before or after the loss.''

He permitted the defendants to introduce such evidence as they had bearing upon this subject, and submitted the issue to the jury. Therefore the defendants could not have been harmed by the failure of the chancellor to give the instruction quoted. The submission of this issue and the introduction of the evidence referred to on both sides necessarily meant that the jury were to decide the issue regardless of whether the defendants had withdrawn from the arbitration. It would therefore have been an idle thing, as we conceive it, for the chancellor to give the instruction mentioned. Moreover, it would have been laying stress upon a special item of evidence, viz., the effect of withdrawal from the arbitration as bearing upon the issue submitted, and this would have been contrary to the rule that the trial judge cannot emphasize special parts of the testimony to the exclusion of the other parts, laying stress now upon this, and now upon that, portion of the evidence.

In the discussion, however, to this assignment in the brief of defendants' counsel, it is applied to the issue of good faith on the part of the insurance companies; that is, the question arising under issues Nos. 3, 4, and 5, which were decided in their favor. So considered, we must apply what has already been said under that head, to the effect that, since the defendants were suc-

cessful under those issues, the question is now immaterial.

Assignment No. 11 claims that the chancellor erroneously refused to give the following special instruction:

"If you find that C. C. Hanson, receiver for the Gulf Compress Company, furnished proofs of loss, making a total claim against the insurance companies of $63,000, and you further find that the amount of this claim did not truly and correctly represent the amount of his loss, and if you find that at the time he made said proofs of loss he knew that another compress, machinery, and boilers, etc., of a similar type in all respects, capable of doing the same amount of work as the old damaged press, could have been purchased and installed for $15,000, or less than the amount claimed on item 1 (compress, machinery, etc.) then you will answer No. 6: 'Yes.' "

Among other reasons not necessary to be stated, the instruction assumed as a fact that at the time Hanson made the proofs of loss he knew that he could purchase another compress of similar type and capable of doing the same work as the damaged press, when there was no evidence of this kind in the record. The proofs were made in April. It does not appear that Hanson learned of the other press until some time in July. It is not disputed that he then offered to take that press in full settlement of the loss, if the insurance companies would furnish it to him, or pay him in money a sum

which would purchase it and install it; that is, $15,000. This was refused by the companies.

Under assignment No. 12 the point is made that the chancellor erred in permitting the witness Hanson to answer the following:

"Did they [referring to the insurance companies] at any time, by letter or otherwise, up to the filing of the cross bill in this case, state to you that you had knowingly made a false statement as to the value of this property for the purpose of deceiving and defrauding the company? A. No."

The objection made on the trial was that the evidence was immaterial. We think the objection was well taken, but the evidence could not have injured the defendants, and the error was not, therefore, a reversible one, to say nothing of chapter 32, Acts of 1911, which forbids the court to reverse unless it affirmatively appears that the error affected the verdict. As stated, the contrary appears, because there was no pretense that Hanson had knowingly made a false statement as to the value of the property, except in so far as that matter was related to his supposed knowledge of another compress of substantially the same kind, procurable for $15,000. We have already stated in another connection that there is no evidence that he had any such knowledge. It is true that the insurance companies, even if they believed he had made a false statement, were not bound to make that charge to him, and no adverse inference could be properly indulged against them because of their failure to make

the charge. But for the reason stated the error was innocuous.

We have thus considered all of the errors assigned which could under any kind of construction have a bearing upon issue No. 6; but, as already held, we are of the opinion that that issue was, for the reasons given, an improper one—that is, because of the confession of liability on the part of the insurance companies. Therefore all of the questions raised on the issue were really immaterial. Out of deference to the learned counsel, however, we have considered them, and stated our conclusion in respect of each of them.

This brings us to the main questions in the case, those falling under issues Nos. 1 and 2. The questions chiefly arise under issue No. 1.

Assignment No. 13 makes the point that there is no evidence to sustain the finding of the jury under these issues, and No. 14 makes the point that the amounts found were excessive. There was ample evidence under which the jury acted, and the rule is that, where there is any evidence to sustain the verdict on the facts, we cannot interfere.

It is complained under assignment No. 1 that the chancellor refused to charge the following special request, offered by defendant's counsel:

"If you find that a compress, machinery, boilers, etc., of a type similar in all respects to the compress, machinery, etc., that was injured in the fire on March 1st, could have been purchased at Natchez, Miss., at or immediately after the fire, for the sum of $10,000,

plus the cost of dismantling, installing, and freight, about $5,000, according to the statement of Mr. Hanson, and you further find that the compress, boilers, and machinery were a total loss, then the amount for which the press at Natchez could be purchased, $15,-000, should be your answer to issue No. 1.''

This assignment also complains of the refusal of the chancellor to charge:

''The policies in question provide that loss or damage shall be estimated or ascertained according to the actual cash value with proper deduction for depreciation, and 'shall in no event exceed what it would then cost the insured to repair or replace the same with material of a like kind and quality.'

''Should you find that the compress, boilers, machinery, etc., at or immediately after the fire could have been purchased and installed in the Gulf Compress Company's plant at Argenta, Ark., for $15,000, that figure or amount should represent the amount of the insured's loss upon the compress, machinery, boilers, etc., and you should answer issue No. 1 accordingly.''

Both of the instructions were properly refused, because they assume a fact, as to which there is no testimony in the record, viz., that such a compress as is referred to in the instructions could have been purchased at or immediately after the fire for the sum of $10,000, plus the cost of installation, say about $5,000, in all about $15,000. As we have previously said, in disposing of another assignment, the opportunity to buy such machine at Natchez, Miss., because of the

great devastation by the boll weevil in that country, did arise in July, 1913; but this was more than four months after the fire, and there is no evidence that this machine could have been purchased at that price at any time before July 5th, or at any time thereafter. The only evidence upon the point is that which appears in Mr. Hanson's testimony, which is as follows:

"When I made the proposition to Mr. Shafer [representing the insurance companies] to take that Natchez press, if he would dismantle it and bring it to Argenta and put it up, he did not accept the proposition. I put that to Mr. Shafer in this way: We had big cotton prospects in Arkansas, and I was anxious to rebuild. Our operations are profitable there, and I wanted to keep going, and the trade was after me to go ahead and rebuild, and now I said to Mr. Shafer: 'If you will take that Natchez plant and put it down at Little Rock, we will call the machinery part of it square. I estimate it will cost $5,000 to move it. It may cost you a little less, or a little more. Here is a telegram that says you can get it for $10,000. Now give me that plant in Little Rock and we will call the machinery part square, and we will take up the question of the buildings; or, if you don't want to go to the trouble of taking that plant and moving it and building it, give me $15,000, and I will go and buy it and move it myself'—because I was anxious to get this thing settled, to get the benefit of the particular advantages existing at that time. Q. Do you know whether you can get it at all, now? A. No, sir; he

said I had insulted his intelligence, and he was rather hard to talk to on that account. He seemed to think it was insulting his intelligence, and he objected to it."

Mr. Hanson further testified:

"I do not know where I could get a press at any such price now."

Not only were the instructions properly disallowed, because of the incorrect assumptions of fact therein contained, but likewise on the ground that after such refusal the companies would be estopped to base any claims on the offer made at Natchez in July, 1913.

The second assignment of error complains of a certain portion of the charge. The assignment as drawn omits, supplying the blank with asterisks, certain words which we deem material to a proper understanding of the views of the trial judge as given to the jury.

The language of the charge complained of was as follows:

"You will find in the policies the provision that the actual cash value of the property damaged at the time of the fire is to be the test. Now actual cash value means the value of a thing upon the market—what it would cost to produce it in like condition, as it was before the fire. If you find that the press and machinery were a total loss under issue No. 1, you will ascertain at what figure another press, machinery, boilers, etc., similar in all respects to that destroyed, could have been purchased, and that figure will and should be your answer to issue No. 1.

"So far as the proof goes, gentlemen, as to another press that could have been purchased at Natchez, Miss., if that was a purchase that could have been made only at a particular time, and not one that could have been made on the open market at any time, and if that was meant merely as a matter of compromise, why you may consider that—you may look to that in determining the value of a new press; and, assuming this to be a total loss, the test is what another press —what it would cost to procure another press—just as good as the one in question before the fire."

The policy provision referred to reads:

"This company shall not be liable beyond the actual cash value of the property at the time any loss or damage occurs, and the loss or damage shall be ascertained or estimated according to such actual cash value, with proper deduction for depreciation, however caused, and shall in no event exceed what it would then cost the insured to repair or replace the same with material of like kind and quality."

The facts applicable to issue No. 1, as to which the instruction complained of applies, are as follows:

The Bierce compress, which was the subject of the insurance, was the best and likewise the most costly one made. It is true it was slower in its operation than others, and a little more expensive in the way of fuel, but less liable to accident, and an accident occurring by the breaking of any of its parts would rarely ever result in the death of any of the operatives, or in any injury to the plant. Though slower, as stated,

this type of machine is very durable, and is sufficiently rapid in its movements to accomplish all needed work. The initial expense is a little over $40,000. By reason of this fact it is no longer made for the general market, and can be purchased only, if at all, on special order; that is, to be made for special order. Its place in the general market has been taken by cheaper machines doing practically the same work, although not so safely.

The history of the special compress in question is as follows:

It was bought six or seven years before the fire in question from a firm or concern in New Orleans that had used it but little, and had gone out of business. Complainants bought it at a sacrifice price of $11,500, including cost of removal and reinstallment, but it was as good as new. It was moved to Argenta, Ark., by complainants and set up there. It went through a fire in 1911, but comparatively slight in character, only the smaller parts of the machine being injured, and repairs were made which restored it to a condition as good as new. Then came the fire of 1912, which the evidence shows was a very great one; 7,000 to 9,000 bales of cotton, ranged near the machine, were burned; steel was melted and ran very close to this great compress, and the heat was so great, mounting up to 2,900 degrees, as that the machine was practically ruined.

The amount for which the machine was insured in 1911 was $15,000. The policy at that time was placed

at the figure stated, because complainants had learned primarily where they could procure another machine as good as their own at second hand for the price named. But, the policies having a coinsurance clause, the companies proved by the appraisement of Coats and Burchard, well-known public appraisers in Chicago, that the machine was worth $40,000, and compelled complainants to account for it on that basis, by means of which they lost, under the coinsurance clause, between $7,000 and $8,000.

We have already referred, in another part of this opinion, to the nature of the opportunity to obtain another machine of the Bierce type after the fire of 1912. As stated, there was another machine just as good in Natchez, Miss., that could have been procured in July, 1913, for $15,000, because of the prevalence of the boll weevil in that part of the country, which had ruined the cotton crop. As already stated, this matter was brought to defendant's attention, and an effort was made by complainant to settle on procurement of that machine for them; but the defendants indignantly refused the offer.

There is no evidence to show that it could have been procured for that price at any earlier or later date, or any other machine of the kind for that price.

As applicable to these facts, we think the charge is correct. Certainly there is nothing in it of which the defendants could complain. It is substantially in accord with the rule contended for by them, for which they cite *McCready* v. *Hartford Insurance Co.,* 61

App. Div., 584, 585, 70 N. Y. Supp., 778, 779; *Standard Sewing Machine Co.* v. *Royal Insurance Co.*, 201; Pa., 645, 649, 650, 51 Atl., 354; *Everett* v. *Insurance Co.* (Tex. Civ. App.), 36 S. W., 125; *Frick* v. *Insurance Co.*, 218 Pa., 409, 67 Atl., 743  We shall quote from one of these cases, the first mentioned, as follows:

"The plaintiffs claim that there was a total loss, . . . and that the verdict should have been for the full sum of $5,000 [the amount of the policy].  They insist that upon a correct construction of the policy the underwriter was liable for a total loss.  The real question upon this branch of the case is:  What is the measure of liability of the defendant under its policy?  The plaintiffs insist that it was the value of the building as it stood just before the fire.  Under the terms and conditions of the policy in suit, which is . . . standard form, . . . the parties have . . . agreed [among themselves] upon the measure of liability. . . . It is provided . . . that 'the company shall not be liable beyond the actual cash value of the property at the time any loss or damage occurs, and the loss or damage shall be ascertained or estimated according to such actual cash value, with proper deduction for depreciation, however caused.  Thus far, and if nothing more were contained in the policy, it is apparent that if there were a total destruction . . . the company would be liable for the actual cash value at the time [of the loss]; but the policy also provides that the liability of the underwriter 'shall in no event exceed what it then cost the insured

to repair or replace the same with material of like kind and quality.' By this stipulation the parties settled for themselves the measure of damages in case of loss. Plaintiffs expressly agreed [thereby] that the indemnity to be furnished . . . should be the sum that it would cost the insured to repair or replace the building with material of like kind and quality.''

Complainant's counsel have insisted that, because defendant did not specially plead the second part of the standard clause, they cannot rely on it. citing *Mechanics' Insurance Co.* v. *C. A. Hoover Distilling Co.,* 182 Fed., 590, 105 C. C. A., 128, 31 L. R. A. (N. S.), 878.

Defendant's counsel insist that the rule stated in the opinion referred to is unsound in principle and not supported by the authorities cited therein. From what has been said it is apparent we have no need to consider this question.

It appears that complainant's plant was under mortgage to a trustee for the benefit of certain bondholders for an amount in excess of the whole insurance, and that the rights of the bondholders were fully recognized and protected in the policies; also that by an amendment to the bill the trustee for the bondholders came in and asserted his right and their rights. It is argued for them that as between them and the companies they occupy a certain *status* superior to that of the compress company, in that they are relieved of any derelictions and defaults charged by defendant against the complainant corporation. From the view

Compress  Co.  v.  Insurance  Co.

we take of the case it is apparent that this question likewise needs no discussion or decision at our hands at the present time.

It results that there is no error in the decree of the chancellor, and it must be affirmed, with costs.