STEVENS v. MOORE.—139 S. W. (2d) 710.

Middle Section.   January 27, 1940.

Certiorari Denied by Supreme Court, May 18, 1940.

Chas. D. Fox, of Nashville, for plaintiff in error Stevens.

Levine & Levine, of Nashville, for defendant in error Moore.

FAW, P. J.   This action originated in the Court of General Sessions of Davidson County on April 4, 1938, wherein Mrs. Pauline Stevens sued R. T. Moore, doing business as Economy Dry Cleaners, and in the warrant then issued the plaintiff's cause of action was stated as follows:

"a civil action brought by Mrs. Pauline Stevens, for negligence in the dry cleaning of one 9x12 American Oriental rug of the approximate value of $85.00, said rug being sent during May, 1937, and not returned until about February, 1938, by the defendant in a ruined condition, under Five Hundred Dollars."

The Court of General Sessions, Part One, gave judgment for the plaintiff and against the defendant for $50 and cost of suit.   Thereafter, in due season, the case was (pursuant to Section 6 of chapter 12 of the Private Acts of 1937) removed by certiorari to the Circuit Court of Davidson County, where it was tried to a jury, and the jury found the issues in favor of the defendant, and the Court dismissed the plaintiff's suit at her cost.

The Trial Judge overruled a motion for a new trial seasonably made on behalf of the plaintiff and granted an appeal in the nature of a writ of error prayed for by the plaintiff, which appeal was perfected by the plaintiff, and she has assigned errors in this Court. For convenience, we will continue to refer to Mrs. Pauline Stevens as plaintiff and to R. T. Moore, etc., as defendant.

Plaintiff's first assignment of error is, that there is no evidence to support the verdict.

It appears from the bill of exceptions that, at the outset of the trial below, "the warrant was read to the court and jury and the defendant entered an oral plea of not guilty."

We have hereinbefore stated the plaintiff's cause of action, as set forth in the warrant.   The Act creating and establishing the Court of General Sessions of Davidson County (Private Acts of 1937, chapter 12) provides, in section 6 thereof, among other things, that "the rules of pleading and practice" and "forms of writs and process . . . shall be same as of Justices of the Peace."   It follows that in proceedings in the Court of General Sessions of Davidson County, as in proceedings before Justices of the Peace, the strictness and precision in pleading required in courts of record will not be enforced.   Memphis St. Railroad v. Flood, 122 Tenn., 56, 113 S. W., 384.

But the warrant "must contain a brief statement of the cause of action sufficient to give the defendant reasonable notice of what he is called upon to answer."   Memphis St. Railroad v. Flood,

supra, 122 Tenn., page 78, 113 S. W., page 389. It is a necessary corollary of the rule last stated that, if the plaintiff complies therewith, he (or she) must recover, if at all, upon the cause of action stated in the warrant and, as the burden of proving her alleged cause of action, in the instant case, was primarily upon the plaintiff, it becomes necessary, in order to dispose of plaintiff's first assignment of error, supra, for us to ascertain whether there was any material evidence before the jury which reasonably tended to prove that the defendant dry-cleaned the plaintiff's rug, described in the warrant, in a negligent manner, and, as the proximate result of such negligence of defendant, plaintiff's said rug was injured and damaged. Unless there was such evidence tending to support plaintiff's cause of action, the verdict for defendant was proper, whether there was or not affirmative evidence tending to support defendant's plea of ''not guilty.''

However, if it should be found that there was material evidence tending to support plaintiff's alleged cause of action, it then becomes necessary to inquire whether there was countervailing evidence which, if accepted by the jury as the truth of the case, was sufficient to support the verdict of the jury in favor of the defendant.

The evidence introduced by the plaintiff consisted of the testimony of herself and of her mother, Mrs. A. S. Kimbro. The evidence introduced for the defendant consisted of the testimony of defendant's wife, Mrs. R. T. Moore, and Frank Muller, an employee of the defendant. The rug in controversy and two small rugs were put in evidence as exhibits to the testimony of some of the witnesses, and have been sent up with the record to this Court.

Mrs. Pauline Stevens, the plaintiff, testified that she was the owner of the American Oriental rug, size 9′ x 12′, which she had purchased in Indiana the latter part of 1933 or the first part of 1934, paying $85 for it; that she had permitted her mother, Mrs. A. S. Kimbro, to use the rug, and in the month of May, 1937, while plaintiff was in New York, her mother sent the rug to defendant's place of business to be cleaned; that plaintiff returned to Nashville in the month of November, 1937, and then learned that the rug had not been returned by the defendant; that plaintiff and her mother sought, by repeated calls on the telephone to defendant's driver and to defendant's place of business, and by repeated personal calls at defendant's place of business, to procure the return of the rug to plaintiff's home, and was assured ''that the rug would be delivered right away,''·but the rug was not returned to plaintiff's home until a day in February, 1938, at which time defendant's driver, Frank Muller, brought it in, and it was found to be ''spotted, faded and the colors had run, the blue figures into the red and vice versa.''

Plaintiff further testified that when the rug was brought back to

her home in the condition above stated she refused to accept it, and the defendant's driver, Frank Muller, suggested that the rug could be dyed by the defendant and the dye would cover up the pattern, and the fading and running of the colors would be covered by the "dyeing" and come out satisfactory; that plaintiff agreed to the dyeing of the rug on the condition that it would be solid in color, thoroughly covering the pattern so that it would not show and that the work would be satisfactory; that Muller, defendant's driver, told plaintiff at that time "that it would be all right, that they did it all the time."

Plaintiff stated further that the rug was then taken back to defendant's place of business and dyed and then brought back to plaintiff, but plaintiff found, on examination of the rug, "that the pattern showed through very plainly, the dyeing was not done well, and the rug was even worse than when it had been brought back from cleaning;" that plaintiff and her mother at that time complained very strongly to the driver about the condition of the rug, and the driver stated to them that he would not have a rug like it in his home, and suggested to them that they let him take it back and have it dyed a second time; that plaintiff permitted the driver to take the rug back to defendant and it was dyed a second time and returned, but after such second dyeing it was found that "the dye was in spots and all the pattern and colors showed through the second dyeing;" that plaintiff refused to accept the rug in its then condition and the driver carried it back to the defendant's place of business; that later the driver brought it back another time and came to the door of plaintiff's home and told her and her mother that he had the rug in the truck but did not feel like bringing it in because he knew plaintiff would not accept it.

Plaintiff stated further that the rug had been cleaned twice before by the American Dry Cleaners, of Nashville, Tennessee; that the last cleaning by the American Dry Cleaners had been about a year before it was sent to defendant's place of business; that in each of the two times it came back from the American Dry Cleaners in perfect condition and none of the colors had run or faded, and there were no spots on the rug; that the cleaning process of the American Dry Cleaners made the rug come back in "a condition like new."

Plaintiff stated further that the rug was not worn, the pile of the rug was still thick and full, without any spots being worn in it; that the rug had been used for short periods of time since it had been purchased in the latter part of 1933 or the first part of 1934; that it had been stored until the summer of 1935, when it was used in the home of plaintiff's mother, where plaintiff lived, up until May, 1937, when it was sent to the defendant's place of business for cleaning, and this period of two years was nearly all the use that the rug had had; that in May, 1937, when the rug was sent to the

defendant's place of business for dry cleaning, plaintiff's mother's home was being repapered, cleaned and redecorated, and that was the occasion for having the rug cleaned.

Plaintiff stated further that she had testified in the General Sessions Court, and had been present when the defendant, R. T. Moore testified, and he testified that he was not an expert, and stated that in the General Sessions Court her attorney had taken a handkerchief and rubbed it on the rug and the dye from the rug had come off on the handkerchief.

Plaintiff also testified, without objection, that she had also heard Mr. H. B. Franklin under oath on behalf of the defendant, in the General Sessions Court; that said Franklin testified as an expert (he being employed by McEwen's Laundry) "that the colors in a rug should not run if the rug had been dry-cleaned before and the colors during the first cleaning had not run, and had heard him testify as to the proper way to clean a rug." Plaintiff further testified that she had two small companion rugs which had matched the rug sent to defendant's dry cleaning establishment which were also American Oriental rugs, and that they matched the large rug that defendant had cleaned and dyed, were of the same pattern and color as the large rug, and that the small rugs could not be used with the large rug in its dyed color, that the dyeing did not cover up the pattern in the large rug and the dye came off of the rug.

Plaintiff further testified that she was familiar with the prices of second hand furniture and rugs, and stated she estimated the value of the rug before it was sent to defendant's place of business at about $50, and the value of the rug after it came back from the defendant's place of business after it was dyed several times was ruined and she would not have it in her home. Plaintiff made the small companion rug exhibit one to her testimony.

Plaintiff was cross-examined at length, but her testimony on cross-examination was mainly a repetition of her testimony in chief, except that she stated that her mother was authorized to have the rug cleaned.

The testimony of Mrs. A. S. Kimbro, plaintiff's mother, was substantially the same, in all material respects as the testimony of the plaintiff; but Mrs. Kimbro further stated that she began calling for the return of the rug in August, 1937, and called defendant's place of business at frequent intervals until the return of plaintiff to Nashville in November, 1937, but without success.

We will quote the testimony of the defendant's witnesses, as it appears in narrative form in the bill of exceptions.

Mrs. R. T. Moore testified as follows:

"That she was the wife of the defendant and worked and managed the office of the defendant's place of business. That she saw the rug when it was brought in and that it was cleaned at their

place of business. She stated that the rug had been cleaned and then put aside and that nobody had called for the return of the rug until some time in November, 1937, and that shortly thereafter they had sent the rug out and it was brought back by the driver, and that they had dyed the rug and sent it back and the driver had again brought the rug back to be redyed, it was done and the rug sent back by the driver, who brought it back again and later they sent it another time and it was sent back again and had been kept by them at their place of business until it was brought in at the time of the hearing in the General Sessions Court.

"She stated that she did not testify in the General Sessions Court, since she was ill at the time and could not be present.

"She stated that no one had called her until November, 1937, and that she received all the calls if any were made and denied that they had been notified before that time to return the rug.

"She stated that the rug, when it was brought to their place of business for cleaning, was in a dirty condition, and after cleaning it had the appearance of being faded from the light, and that it was in a much better condition now with its dyed colors than before.

"Cross-examination:

"She stated that she was in charge in the front office of the place of business and kept the books and managed the office in general. She stated that there was a young lady working in the office but said that she received most of the calls over the telephone that came in.

"When the rug was brought in to be cleaned she said that it was rolled up at the time it was brought into the office and carried into the back part of the establishment and that some colored boys did the cleaning under the supervision of her husband. She did not go back but left this to her husband who had charge of that part of the business. She stated that she did not know why her husband was not testifying and further stated that the colored boys were still working for them and were available as witnesses. She further stated she knew Mr. H. B. Franklin and that he was working for McEwen's Laundry in Nashville, Tennessee.

"She had not been present in the General Sessions Court, nor testified in the first trial of this case because of illness.

"She further stated she was not an expert on rugs, that she had never sold a rug like the one in question nor bought one but stated that the rug was in a better condition since it had been dyed than when it was first sent to their place of business.

"She stated that it was not usual for their establishment to dye rugs when they were sent to be cleaned nor to dye them twice. She stated no charge was to be made for the dyeing of the rug. The charge for the cleaning of the rug was $2.50 which had never been paid."

Frank Muller testified as follows:

"That he had been employed by the defendant as a driver for six years. That he had known the plaintiff for two or three years and at one time had lived in the same apartment. He had picked the American Oriental rug up about the first of May, 1937, at Mrs. Kimbro's home; Mrs. Stevens was not there. Mrs. Kimbro wanted the rug cleaned by the time of her daughter's return from New York. He never received any notice to return the rug until months after it had been sent for cleaning and at that time Mrs. Kimbro and Mrs. Stevens called defendant's office. That the rug at that (time) had been cleaned over again about a week or ten days before it was carried out. He stated that he had no telephone in his home and had never received any message about the rug. He stated that he had dropped by Mrs. Kimbro's home and plaintiff's to pick up suits and dresses and that the first time he knew when to return the rug was when she called at the office. When the rug was first delivered plaintiff was not satisfied and would not have it and asked him if the rug could be dyed and if it could be guaranteed as to solid colors and if it would turn out satisfactory. He stated that rugs were dyed many times, that it would come out as a solid color. She consented to the dyeing of the rug and when he later brought the rug back dyed plaintiff refused to accept the rug, saying that she did not like the color. He denied saying that he would not have a rug like it in his home. He stated that as to the rug, it was all right and in as good a shape as it was before. He made the 9′ x 12′ rug in question Exhibit 'A' to his testimony.

"Cross-examination:

"He stated that his duties were to call for and deliver orders and that he got the order to pick up the rug at the office. His instructions at the time regarding the rug were to clean it. He stated that the rug was real dirty and that after it was cleaned it was light in some places and faded in some places. He stated that the plaintiff refused to accept the rug and plaintiff suggested the dyeing. After the dyeing he returned the rug to plaintiff she refused acceptance again. He admitted that the pattern had not been concealed by the dyeing and stated that he took it back for a second dyeing and plaintiff refused to accept the rug again. He stated that the pattern still showed through. He took the rug back to the defendant's place of business and later carried it back to plaintiff but did not take the rug in saying that he knew plaintiff would not accept it.

"He stated that before he first brought the rug out after it had once been cleaned that it had become soiled and dirty at defendant's place of business and had to be recleaned before he could take it out.

"He stated that he knew nothing of the cleaning process used on the rug, that his duties were outside and that Mr. R. T. Moore was

in charge of that work. He said it was not a usual thing for them to dye a rug when it was sent for cleaning. No charge was to be made for dyeing the rug."

The comparative credibility of the witnesses was peculiarly a matter for the jury to determine. The verdict implies that the jury resolved all material conflicts of testimony in favor of the defendant's witnesses. Considering the evidence submitted to the jury in that aspect most favorable to the defendant of which it is reasonably susceptible, *and discarding all countervailing evidence,* we are of the opinion that there is some (though meager) to support the verdict of the jury; and plaintiff's first assignment of error is overruled.

Through her second and third assignments of error, the plaintiff complains of the refusal of the Trial Judge to give in charge to the jury two special instructions seasonably requested by the plaintiff, which requests, numbered one and two, respectively, were as follows:

No. 1. "The Court instructs you, gentlemen of the jury, that if it appears that a party to the suit has particular knowledge of the material facts in a case and fails to testify, that from such failure the law presumes that his testimony, if given, would be against him."

No. 2. "The Court further instructs you that if it appears that a party to a suit has available witnesses which have knowledge of facts material to his case and does not call upon these witnesses to testify as to such material facts, the law presumes that the testimony of such witnesses would be against the party failing to call them."

For the reasons which we will presently state, we are of the opinion that it was error to refuse to give in charge to the jury the instructions thus requested.

Referring to "Bailments for Improvement, Alteration, or Repair of, or Work upon, Chattel," in 6 American Jurisprudence, page 353, section 264, it is said:

"In such a bailment, if for reward, immediately upon delivery of the article the law implies a contract that the work shall be done with due care and competent skill, and that the article, when the work is completed, shall be reasonably fit for the purpose or use intended, in contemplation of which the parties entered upon the bailment; the bailee is under a duty to use ordinary care, not merely to select competent employees, but to do the work required with ordinary skill and judgment. It is said that in this class of bailments 'ordinary care' is a term of intense relativity. The bailee promises the skill of his art. He may, however, use the usual means of executing the bailment, and unless the contract requires the personal services of the bailee, he may have the work completed by third persons, but he is answerable for any failure of such persons to exercise the requisite care and skill.

"The rule supported by the decided weight of authority is to the effect that a bailee who contracts to make repairs, and performs the work in an unskilful or negligent manner, is liable for the damage proximately resulting from the improper performance, and which can be regarded as having been within the contemplation of the parties."

In section 265 (on pages 354, 355) of the same volume, it is said:

"A contract of bailment, in the absence of special stipulations to the contrary, involves, by necessary inference, an understanding that the bailee may use the usual terms of executing the agreement. He may, therefore, where the bailment does not import a personal trust, employ assistants and delegate the work, in whole or in part, to them, but he will be held responsible for their conduct while acting within the scope of their employment. While he is not generally regarded as an insurer of the conduct of his employees, he is answerable, of course, for any wrongful acts of his employees which he directly authorizes or subsequently ratifies, or which are done as a proximate result of his own negligence. He is responsible, moreover, for the exercise of the proper degree of care (depending upon the general rules as to care required of the various classes of bailees) in the selection of his agents and their retention in his employ, including the maintenance of a reasonable surveillance and supervision over them so as to ascertain their continued fitness, both in ability and integrity, for the duties with which they are intrusted. He is always answerable for loss or injury in respect of the thing bailed, which results from the negligence or wrongful acts of such employees in the execution of the bailment, so far as they are within the course, or the real or apparent scope, of their employment."

It is a noteworthy fact on this record that the defendant did not introduce, or offer to introduce, a witness who had any knowledge of the manner in which plaintiff's rug was cleaned or dyed in defendant's place of business. Defendant's wife testified that she is office manager and bookkeeper, and that her husband (the defendant) had charge of that part of the business where the cleaning was done by some colored boys under the supervision of her husband. Defendant's witness Muller stated that "his duties were to call for and deliver orders;" that "he knew nothing of the cleaning process used on the rug;" and that "Mr. R. T. Moore, (the defendant) was in charge of that work." The testimony of the plaintiff and her mother was to the effect that the rug in question was seriously injured—practically "ruined"—while in the possession of defendant. "The return, by a bailee of goods in a damaged condition is in itself proof of negligence if the subject of the bailment is such that injury would not ordinarily have occurred without negligence on his part." 6 Am. Juris., page 469, sec. 392.

And in section 379, on page 460, of the same volume, it is said:

"Since the facts surrounding the loss are, ordinarily, peculiarly within his knowledge, courts taking this view support the rule that to overcome the presumption of negligence or prima facie case, the bailee's duty in this respect includes production of evidence that the loss was not attributable to any want of due care on his part, and that to this end he is bound to disclose fully, in so far as he can, the manner in which the loss occurred, the facts and circumstances attending it, and the precautions taken to prevent it." The opinion in the case of Peerless Dry Cleaning Company v. Carmack, 8 Tenn. App., 103, is in accord with the above quoted text from American Jurisprudence.

The record shows affirmatively that defendant Moore was present in the courtroom during the trial below, and that the said "colored boys" were still working for defendant and were available as witnesses at the trial. Upon the record facts, it may be reasonably assumed that defendant Moore and his said employees—the "colored boys"—know more than any one else about the treatment of the rug while it was in the possession of the defendant; but neither the defendant nor any of said "colored boys" were offered as witnesses, and their failure to testify is not explained. Mrs. Moore said that "She did not know why her husband was not testifying."

"The presumption always is that competent and pertinent evidence within the knowledge or control of a party which he withholds is against his interest and insistence." Standard Oil Company v. State, 117 Tenn. 618, 672, 100 S. W. 705, 718, 10 L. R. A. (N. S.), 1015.

"It is a well-settled rule of evidence that when the circumstances in proof tend to fix a liability on a party who has it in his power to offer evidence of all the facts as they existed, and rebut the inferences which the circumstances in the proof tend to establish, and he fails to offer such proof, the natural conclusion is that the proof, if produced, instead of rebutting, would support, the inferences against him, and the jury is justified in acting upon that conclusion." Fisher v. Insurance Co., 124 Tenn., 450, 483, 138 S. W., 316, 324, Ann. Cas. 1912D, 1246. See, to same effect, Western Union Telegraph Co. v. Lamb, 140 Tenn., 107, 111, 203 S. W., 752; Citizens Bank v. Langford, 6 Tenn. App., 238, 242.

"Where it is apparent that a party has the power to produce evidence of a more explicit, direct, and satisfactory character than that which he does introduce and relies on, it may be presumed that if the more satisfactory evidence had been given it would have been detrimental to him and would have laid open deficiencies in and objections to, his case, which the more obscure and uncertain evidence did not disclose." 22 C. J., page 115, sec. 55.

"Failure of a party to call an available witness possessing peculiar knowledge concerning the facts essential to a party's case,

direct or rebutting, or to examine such witness as to the facts covered by his special knowledge, especially if the witness would naturally be favorable to the party's contention, relying instead upon the evidence of witnesses less familiar with the matter, gives rise to an inference that the testimony of such uninterrogated witness would not sustain the contention of the party. No such inference arises where the only object of calling such witness would be to produce corroborative, cumulative, or possibly unnecessary evidence; or when an adverse inference would be improper for any other reason, as for example where the witness not called is the attorney for the party, or is mentally unsound, or there is some legal prohibition against calling or eliciting the desired evidence from the witness." Id., pp. 115-118, sec. 56.

"It has been laid down in a large number of cases that where a witness is equally available or accessible to both parties, no presumption or inference against either party can arise by reason of his failure to call such witness. This statement has, however, been characterized as inadvertent, and certainly it would seem that it should apply in its full sense only where both parties are equally interested to procure the evidence of such witness, for a witness, while equally accessible to both parties, may be extremely favorable to one, and unfavorable, or even hostile, to the other, and under these circumstances it would seem a fair inference that the party to whom such witness was favorable omitted to call him because his testimony would not support the contentions of such party. Certainly it is not difficult to find in the reports cases where an unfavorable inference has been indulged against a party who failed to call a witness who naturally would be favorable to him, regardless of the fact that the witness was in court and could have been called and examined by the other party." Id., pp. 119, 120.

In Western Union Telegraph Co. v. Lamb, supra, 140 Tenn., at page 111, 203 S. W. at page 753, the Court said: "Another rule of evidence, which is often resorted to to explain incomplete knowledge, is that where the evidence tends to fix liability on the defendant, and if he has it in his power to offer evidence to rebut the unfavorable inferences which the proof tends to establish, and neglects or refuses to offer such proof, it may be inferred from the facts shown that the fully developed evidence would establish liability upon his part."

And the rule thus stated was applied in the case of Citizens Bank v. Langford, supra, 6 Tenn. App., pages 242, 243, where the Chancellor was "sitting as a jury." Plaintiff's second and third assignments of error are sustained.

Plaintiff's fourth assignment is that the Trial Court erred in charging the jury as follows: "In the event you find for the plaintiff your verdict should be in the sum of $50.00; your verdict must be $50.00 or nothing."

74

It is insisted for plaintiff that, in thus instructing the jury, the Court invaded the province of the jury. ''Generally speaking, it is for the Court to say what acts, omissions, facts, and circumstances are competent evidence of damages to be considered by a jury, but whether they affect property and damage it, and the amount of such damages, is for the jury to say.'' 15 Am. Juris., page 801, sec. 362.

With reference to instructions limiting amount of recovery, it is said in the same volume (pages 810, 811, sec. 371): ''Where the quantum of damages is for the jury, it is generally error to limit the recovery to a specified sum. . . . It is not, however, as a general rule, regarded reversible error for the trial court to instruct the jury specifically or generally that it cannot award damages in excess of the amount claimed in the pleadings, provided it does not state the limitation in such a way as to suggest a verdict for the amount claimed, or make any other suggestion as to the amount of damages that the evidence warrants. Accordingly, it cannot be said that the jury were influenced by the reference to the amount of the plaintiff's claim. But if the reference to the amount of damages claimed appears to have been made in such a manner as to have influenced the jury, such reference is ground for reversing the judgment. In those cases where a court violates the rule that no influencing references should be made to the amount of damages claimed, it has been said that admonitions by the court that such was not the purpose in stating the amount claimed will not be sufficient to eliminate it entirely from the minds of the jurors, but that it will remain with them, and consciously or unconsciously will influence them in arriving at a conclusion.''

In the warrant in the present case it is averred that the rug was ''of the approximate value of $85.00'' when it was delivered to defendant to be cleaned, and that when returned it was ''in a ruined condition.''

The plaintiff was the only witness who undertook to testify with respect to the money value of the rug, and she stated that she estimated the value of the rug before it was sent to defendant's place of business at about $50, and that after it came back from the defendant's place of business it ''was ruined and she wouldn't have it in her home.''

Immediately following the instruction to the jury that ''your verdict must be $50.00 or nothing,'' the Trial Court said: ''This is a suit for the destruction of a rug, and that is all that is involved, is whether or not the rug was destroyed.''

It is seen, from that part of his charge to the jury last quoted, that the learned Trial Judge entertained the view that the plaintiff was suing for the ''destruction'' of the rug (the equivalent of an action for conversion).

We do not so interpret the plaintiff's cause of action as stated in the warrant; and we are of the opinion that it was error to instruct the jury that their verdict "must be $50.00 or nothing."

The averment in the warrant that the rug was returned by the defendant in a "ruined condition" does not *necessarily* mean that this is a suit for the "destruction" of the rug. The word "destruction" means nothing less than annihilation or extinction; whereas (according to Webster's International Dictionary), one of the definitions of the adjective "ruined" is "That has suffered decay, dilapidation, or impairment of effectiveness."

Certainly there was no physical destruction of the plaintiff's rug, and there was a controversy as to whether it had been injured, and its value impaired, by the treatment it had undergone while in the possession of the defendant. Plaintiff and her mother stated that, when returned, the rug was worthless for use as a rug in a home, because of its appearance, but the substance of the testimony of Mrs. Moore was that the condition of the rug was better when it was returned to plaintiff than when it was sent to defendant, and the testimony of Muller was that the rug is as good as it was when delivered to defendant.

But the rug was introduced in evidence and inspected by the jury, and the jury had the right to exercise their common sense and common knowledge and experience in determining the value of the rug and whether or not it is now worthless.

"Usually, testimony of a party or other interested witness as to the value of property involved or the amount of the damage is not conclusive, though not contradicted." 15 Am. Juris., page 801, sec. 361; Annotation, 72 A. L. R., page 55.

"Compensation may be for a pecuniary injury which has resulted as the natural or probable result of a wrong, although the extent of the injury is not capable of precise proof." 15 Am. Juris., page 797, sec. 356.

"There is a clear distinction between the measure of proof necessary to establish the fact that the plaintiff has sustained some damage and the measure of proof necessary to enable the jury to fix the amount. Formerly, the tendency was to restrict the recovery to such matters as were susceptible of having attached to them an exact pecuniary value, but it is now generally held that the uncertainty which prevents a recovery is uncertainty as to the fact of the damage and not as to its amount and that where it is certain that damage has resulted, mere uncertainty as to the amount will not preclude the right of recovery. This view has been sustained where, from the nature of the case, the extent of the injury and the amount of damage are not capable of exact and accurate proof. Under such circumstances all that can be required is that the evidence, with such certainty as the nature of the particular case may

permit, lay a foundation which will enable the trier of facts to make a fair and reasonable estimate, and the plaintiff will not be denied a substantial recovery if he has produced the best evidence available and it is sufficient to afford a reasonable basis for estimating his loss.'' 15 Am. Juris., pages 414, 415, sec. 23.

We think it was error to instruct the jury that their verdict must be $50 or nothing; and plaintiff's fourth assignment of error is sustained.

Plaintiff's fifth assignment is that the Trial Court erred in charging the jury as follows:

''There is evidence to show that the rug when it was returned was better than when sent to defendant to be cleaned.''

There was evidence by *one witness*, defendant's wife, as stated in the instruction challenged by plaintiff's fifth assignment of error, supra, and defendant's witness Muller stated that the rug was ''in as good a shape as it was before.'' But there was evidence (by plaintiff and Mrs. Kimbro) that when the rug was returned it was not ''better,'' or not ''as good,'' as when sent to defendant to be cleaned, but that it was a good rug, worth $50 when sent to defendant to be cleaned, and was worthless for use as a rug in a home when returned; and this evidence on behalf of plaintiff was not mentioned in the Court's charge to the jury.

It is error for the Trial Judge to single out particular facts and give them undue prominence, or emphasize particular evidence, thus leading the jury to believe that the Court thinks such evidence of greater significance and weight than other evidence not mentioned in the charge. Gulf Compress Co. v. Assurance Co., 129 Tenn., 586, 595, 167 S. W., 859; Louisville & N. Railroad Co. v. Evins, 13 Tenn. App., 57, 90; 14 R. C. L., pages 780-782, sec. 48.

The plaintiff's fifth assignment of error is sustained.

The sixth (and last) assignment of error is that the Trial Court erred in overruling plaintiff's motion ''to set aside the verdict and notwithstanding the verdict to enter judgment in favor of plaintiff in error, and that plaintiff in error recover of the defendant her damages to be assessed by the jury.''

The technical record contains no mention of a motion for judgment notwithstanding the verdict, but it appears from the bill of exceptions that a motion substantially as set forth in the sixth assignment of error, supra, was made and filed by plaintiff contemporaneously with her motion for a new trial.

The only argument offered in support of the sixth assignment is, that plaintiff's motion for judgment notwithstanding the verdict should have been granted because there is no material evidence to sustain the verdict.

A motion for a judgment non obstante veredicto is a test of the pleadings, and such judgment must be based solely upon

matters appearing on the technical record, or record proper, and the evidence cannot be looked to in determining such motion. 11 Ency. Pl. & Prac., page 917; Lebanon & Nashville Turnpike Co. v. Creveling, 159 Tenn., 147, 174, 17 S. W. (2d), 22, 65 A. L. R., 440; Citizens' Trust Co. v. Motor Car Co., 154 Tenn., 507, 511, 297 S. W., 735; National Life & Accident Insurance Co v. American Trust Co., 17 Tenn. App., 516, 540, 6 S. W. (2d) 971.

Plaintiff's sixth Assignment of error is overruled.

But for the errors pointed out by plaintiff's second, third, fourth and fifth assignments of error, the judgment of the Circuit Court is reversed, the verdict of the jury is set aside, and the cause will be remanded to the Circuit Court of Davidson County for a new trial.

The costs of the appeal will be adjudged against the defendant R. T. Moore. The costs accrued below will abide the final judgment of the Circuit Court.

Crownover and Felts, JJ., concur.