FRED WILLIAMS, Plaintiff-In-Error, v. AVALON ELIZABETH DANIELS, Defendant-in-Error.

FRED WILLIAMS, Plaintiff-in-Error, v. CHESTER DANIELS, Defendant-in-Error. —344 S. W. (2d) 555.

Western Section at Jackson. June 23, 1960.

Certiorari Denied by Supreme Court March 10, 1961.

Lloyd S. Adams, Adams & Adams, Humboldt, for plaintiff in error.

Robert V. Utley, Milan, for defendants in error.

AVERY, Presiding Judge (W.S.). These suits originated in the Circuit Court of Gibson County, Tennessee and the plaintiffs in each case are husband and wife. The two suits were tried together in the Court below; there is one bill of exceptions covering both cases; there

was a verdict and judgment for each plaintiff; exceptions were seasonably saved; motions for new trials made and overruled; appeals prayed, granted and perfected by defendant, and both cases incorporated in the same record filed in this Court, argued at the same time and will be disposed of in one Opinion. There were two separate verdicts and judgments below and will be two separate judgments in this Court.

The plaintiffs will be referred to in this Opinion in accord with the status each had in the Court below or by personal names; and the defendant will be referred to in accord with the status he had in the Lower Court.

The plaintiff, Avalon Elizabeth Daniels, was injured on or about December 19, 1958, while driving her automobile along Highway 45 East within the corporate limits of the city of Milan, when the defendant while driving his automobile in the same direction on the same Highway so operated his automobile that it struck the automobile of the plaintiff in the rear, and in which collision and as a direct result thereof, the plaintiff, Avalon Elizabeth Daniels, sustained an injury which is usually referred to as a "whiplash injury."

The declaration alleges that the plaintiff was hospitalized for a period of 28 days and she had continually suffered from the date of the injury; that she wore a brace on her back and a leather collar and brace on her neck and had been unable to perform her household duties for months; that slight movements of her body caused excruciating pain and discomfort, and that her injuries were permanent. She alleged her damages to be $15,000 and demanded a jury to try the case.

The declaration of the plaintiff, Chester Daniels, avers the same character of accident in practically the same words, and that the injuries of the same character were inflicted upon his wife; described the pain she had suffered and her incapacity to do her housework, the same as alleged in her declaration; that he was required to employ a housekeeper because of his wife's injury so sustained; that he had spent large sums of money for medicine, doctors' bills, hospital bills, and other expenses, and "lost the services and consortium of his wife, Mrs. Avalon Elizabeth Daniels, which expense, loss of service, and consortium will continue indefinitely in the future". He alleges his damages to be $5,000.

The defendant first filed general issue pleas of not guilty to each declaration. On the day the cases were called for trial, to-wit, August 17, 1959, defendant filed a motion in each of the cases to be—

"(1) allowed to withdraw his not guilty plea; and

"(2) permitted to plead to each declaration by saying:

"The defendant admits that the automobile accident described in the declaration was caused by proximate negligence on the part of the defendant and that plaintiff was not guilty of contributory negligence.

"Defendant denies the plaintiff was injured to the extent averred in the declaration and demands of plaintiff strict proof of all items of damaged claim.

"Having admitted liability to plaintiff, defendant avers therefore, that the only issue for determination

by the jury is the amount of damages which plaintiff is entitled to recover."

The defendant further moved the Court as follows, to-wit:

"Have an order upon plaintiff not to read to the jury and not to refer thereto in the presence of the jury, any allegations in the declaration having to do with or describing an act or acts of negligence on the part of the defendant or the facts surrounding the occurrence of the said automobile accident. Liability having been admitted by defendant, the case should be tried on the issue of damages only and the facts surrounding the occurrence of said automobile accident and the acts of negligence of defendants are immaterial and not the proper subject of proof; and admitting reference thereto or proof thereof in the presence of the jury would be prejudicial to the rights of defendant."

The Court sustained the defendant's respective motions to the respective declarations. After considerable argument, the Court said to counsel:

"Court: Give me the declaration and I will designate just how much can be read.

(Declarations are handed to the Court)

"State the amount sued for and read the part bracketed in each one for the declarations."

Thereupon, Mr. Utley, counsel for the plaintiffs, said:

"Mr. Utley: Gentlemen, in the case of Avalon Elizabeth Daniels v. Fred Williams, the amount sued for is $15,000.00. Now by the Court's instructions,

I will read the portion bracketed of this declaration and omit the rest of it. (Reads)

"In the case of Chester Daniels v. Fred Williams, the amount sued for is $5,000.00. By instruction of the Court I read the portion that is bracketed in this declaration and omit the balance of it. (Reads)"

Mr. Adams, counsel for defendant, then said:

"Mr. Adams: May it please the Court and gentlemen of the jury, as has already been indicated, the plea of the defendant in each of these cases is to the effect he admits he is liable, but he denies that he owes the amount claimed by the plaintiff and we call upon you gentlemen to assess the damages. I will read what we have: This is for Fred Williams.

(Mr. Adams reads plea and motion)

"And then in the case of Avalon Elizabeth Daniels —(reads). Those are the pleas of the defendant."

In this Court the brackets referred to as being made by the Court in the declarations are not shown in this record, so we must assume that only that part of the declarations relating to injuries, medical expenses, etc. were read.

There was a verdict and judgment below for the plaintiff, Avalon Daniels, of $6,000, and for the plaintiff, Chester Daniels, of $2,500.

After the record was filed in this Court, errors were seasonably assigned, in the first two of which the defendant alleges error on the part of the Court by the admission, over his objection, of certain testimony of one Dr. R. J. Barnett, in the argument of which his counsel

states was an admission of "medical testimony as to the mere possibility of permanent injury or disability". The testimony complained of is set out in the assignments.

The third Assignment of Error attacks certain parts of the Charge of the Court to the jury, which counsel states the Court erroneously allowed the jury "to speculate as to the duration" of plaintiff's injuries and whether they were permanent.

The fourth Assignment of Error attacks that part of the Charge of the Court to the jury relating to "loss of consortium", and this part of the charge is alleged to be error because it "overemphasized consortium" and that "consortium was overly detailed and too emphatic".

In the fifth and sixth Assignments of Error, it is set forth that the respective verdicts were excessive, and in the case of Mrs. Daniels, the excessiveness was brought about by the alleged admitted improper proof of alleged permanent injury or disability. In the case of Mr. Daniels, the verdict was alleged to be so excessive as to indicate passion, prejudice, or unaccountable caprice on the part of the jury.

In the motion for a new trial, proper specifications of error were detailed and a basis formed for each assignment.

■ Considering Assignments of Error I, II and III, which should be disposed of together, as related to the injuries of Mrs. Daniels, the specific testimony of Dr. R. J. Barnett, who testified by deposition, objected to as set forth in the Assignments, is as follows:

(1) "Q. 11 Is it entirely possible, Doctor, that she may have to go on taking exercises, having to use

traction and possibly relaxants as long as she lives? A. She may have to have it for a long period of time; how long, it is very difficult to say.

"Q. 12 I will restate my question, Doctor, I will ask you, for how long a period of time it is possible that the same treatments may be prescribed and needed? A. It could be permanent."

Mr. Adams objected to Q. 11 as "leading" at the time the deposition was taken, which objection brought about a restatement of the question, and at the trial when the deposition was read, Mr. Adams renewed his objection, adding, because it calls for an answer merely as to "what is entirely possible", which is not the test and not proper proof. The Court sustained that objection so we can give no consideration to the Assignment as it relates to Q. 11, nor the answer thereto. He raises the same objection to Q. 12, that it called for the expression of a mere possibility and that it was leading. The Court overruled that objection and permitted the question and answer to be read to the jury.

(2) "Q. 19 I would like to ask you, then, is it possible that the curvature of the cervical spine may become worse as time goes on? A. Yes, sir.

"Q. 20 What is the reason for that, Doctor, why would the curvature become worse as time goes on? A. The reason for this would be increasing amounts of osteoarthritis."

At the time the deposition was taken the parties agreed that all objections, except such as might relate to the form of the question, were reserved for the hearing, and when questions No. 19 and No. 20 were being read to the

jury, objection was made that the question called for "a mere possibility" and that the answers expressed a mere possibility. The Trial Court overruled the objection and permitted both questions No. 19 and 20 to be read to the jury. So in these two Assignments, we have to deal with only questions numbered 12, 19 and 20.

The argument in support of these two Assignments is that permanent injuries or disability evidence by a physician must be to a reasonable degree of medical certainty, and that "likelihood, possibility and probability", when shown by the answers to questions under attack, make the question and answer thereto inadmissible.

Counsel for defendant relies principally upon our case of Nashville C. & St. L. Ry. Co. v. Reeves, 25 Tenn. App. 359, 157 S. W. (2d) 851, 855, and the text shown by 25 C. J. S. sec. 149, pp. 799, 800; and Sec. 75, 15 Am. Jur. 488, both under the heading of Damages.

In that case some of the evidence is quoted, and from the result announced by the Court in its Opinion, we can only assume that all of the material evidence relating to the permanency of the injury, as testified to by an expert, is shown. The Opinion does not state that the doctor who attended Mr. Reeves was an orthopedic surgeon. The Opinion simply makes the following statement:

> "Dr. Allen testified that he came to him 'complaining of his back'; that an X-ray picture did not show any injury; that he had a 'wrenched or sprained back'; that 'it may clear up and get over it or may never'."

Upon that evidence, the Court with respect to permanency of the injury, charged the jury:

· "If you find in favor of the plaintiff, upon consideration of the testimony, weighing it carefully, conscientiously, if you find in favor of the plaintiff, you will fix the amount of his recovery of damages, taking in consideration, if you find in his favor, whether his injuries are temporary or permanent injuries, taking also into consideration whether he suffered physical pain, and also consider what medical expenses and doctors' bills he incurred. In short, if you find in favor of the plaintiff, award to him just such amount of damages as will fairly and reasonably compensate him for all the injuries he received."

With regard to the above quoted evidence of Dr. Allen, the Court said:

"The foregoing is not evidence that the injury is permanent.

" 'Testimony of a physician as to the probable effect of the injury is admissible, but it should show that such result is reasonably certain and not a mere likelihood or possibility'. 25 C. J. S. Damages sec. 149, pp. 799, 800; 17 C. J. 1035, sec. 329."

The Court then quoted with approval from 15 Am. Jur., 486, sec. 75, as follows:

"To warrant a recovery for a permanent injury, the future effect of the injury must be shown with reasonable certainty. It is not necessary that the evidence show conclusively or without a shadow of a doubt that the injuries are permanent. But

while absolute certainty should not be required, a mere conjecture, or even a probability, does not warrant the giving of damages for future disability which may never exist.''

The Court also said:

"It was reversible error for the trial judge to charge the jury that it might determine whether his injuries were temporary or permanent. 'In an action for personal injuries the court should not give an instruction allowing the jury to assess damages for permanent injuries or lasting impairment of health, unless there is evidence showing, with reasonable certainty, that such permanent injuries or lasting impairment of health have been in fact sustained by the plaintiff.' 15 Am. Jur. 815, sec. 377; 8 R. C. L. 662, sec. 204.''

If the evidence complained of in the instant case can be lifted out of its context, as shown by the testimony of Dr. Barnett, who is an orthopedic surgeon, fully educated and qualified as such, and consider it standing alone with no supporting text or background, counsel for defendant would be correct. However, from a careful examination of what Dr. Barnett said, as revealed by objective symptoms, and conditions as found to exist in the cervical section of her spinal column, we must accept as the basis for his statement, so objected to and quoted hereinabove, omitting that part of his diagnosis and prognosis which is unnecessary to quote, wherein he set forth the background for his opinion relative to the severity of the injury, by saying:

"Mrs. Avalon Daniels was seen in my office on February 27, 1959, as a referral from Dr. P. D. Jones

of Milan, Tennessee, for evaluation of injuries sustained in an accident alleged to have occurred on or about December 20, 1958. * * *''

(He then states the physical history as given by Mrs. Daniels and continued:)

''On physical examination there was essentially normal range of motion of the cervical spine; however, there was some limitation on rotation to the left and there was pain on all motions of the cervical spine. Pain was particularly severe on rotation to the left, on hyperextension and on flexation. * * * X-rays revealed reversal of the normal cervical curvature, with hypertrophic changes and narrowing of the disc spaces between C5-6 and C6-7.''

(He then stated the treatment he prescribed and continued:)

''She was again seen by me on May 30, 1959. * * * Her hospitalization with traction had given her some relief, but she had permanent changes in her cervical spine that bother her now, and might bother her off and on for many years. * * * She had some ulna type neuropathy which I thought was caused by irritation of the lower branchial plexus and this was frequently on a postural basis, but she did have narrowing in the cervical spine which could cause some irritation of the dermatomes in the upper extremities. * * * X-ray examination at that time continued to show a reversal of the cervical curvature and similar changes as described previously; however, the cervical curvature seems to be somewhat more reversed than previously.

"Although I felt that Mrs. Daniels would continue to show some improvement it is not unusual for persistence of symptoms to occur after an injury of this type, particularly with X-ray findings as indicated."

He then stated what he prescribed for Mrs. Daniels at that time, and was asked:

"Q. 9 How long a period of time will it be necessary for Mrs. Daniels to continue the traction and exercises and relaxants, Doctor? A. We have no means to know how long it will be necessary for her to continue such treatment."

He then stated that surgery was not indicated at that time and was then asked:

"Q. 12 I will restate my question, Doctor, I will ask you, for how long a period of time is it possible that the same treatments may be prescribed and needed? A. It could be permanent."

Counsel for defendant objected and relies upon his statement that the answer calls for and expressed merely a "possibility". We think that the question and answer was proper, and based upon the objective findings set forth above it is clearly shown that his opinion is based upon a reasonable certainty from a medical standpoint.

We think the same is true with respect to questions numbered 19 and 20 and the answers thereto, as quoted on page 5 of this Opinion, which defendant insists was error in admitting in evidence. We see no reason to assume from the testimony which Dr. Barnett had given, when these questions were asked, that the questioner, the witness, and the Court understood that a basis had

been laid by Dr. Barnett, so that his testimony taken as a whole can be and is clearly construed as if he had said:

"What I have said heretofore makes my answers to these questions show that I consider the inquiries to be based upon and call for an amount based upon a reasonable medical certainty."

In the case of Nashville C. & St. L. Ry. v. Reeves, supra, it is not shown that Dr. Allen found any objective symptoms upon which to base his testimony, which our Court held improper. The thing that Dr. Allen said was that the patient, Mr. Reeves, was "complaining of his back" and that an X-ray picture showed no injury, so upon that complaint Dr. Allen simply stated that it was his opinion the patient had a wrenched or sprained back and reiterated a prognosis that "it may clear up and get over it or may never",—all based upon subjective findings from the mere statement of the patient. Neither does it appear in that case that any physician corrobrated the statements of Dr. Allen.

In the instant case, however, Mrs. Daniels was referred to Dr. Barnett by one Dr. P. D. Jones, who testified orally at the trial and stated that he first saw her in December of 1958. He described how she was suffering or appeared to be suffering and his objective findings, as stated:

"The muscles of the cervical area were sore and X-ray films were made and they didn't, they did not reveal any recent or old fractures. There was some narrowing between the 5th and 6th cervical vertebra and 6th and 7th cervical vertebra and 7th cervical and 1st thoracic, and, according to the roentgenologist's report, he said that there was localized osteoarthritic changes at these same levels—that includes

the 5th, 6th and 7th cervical and 1st thoracic. X-rays were made of the lumbar spine and they didn't show any abnormality there.''

Dr. Jones advised immediate hospitalization; (reasons given by the patient for not going to the hospital then were that it was right at Christmas time and on account of her children's Christmas she did not go to the hospital until February 28th); that he saw her on January 12th and again on February 26th and that she had made no progress towards recovery, at which time she was referred to Dr. Barnett, after which she returned to Milan and was hospitalized. The treatment prescribed and given her during her hospitalization is fully shown. When he saw her in February she could not hold her head up without taking her hands to hold it up. He saw her again sometime in May and again in August. He then concluded his general statement by saying:

"The diagnosis on Mrs. Daniels has remained the same all the way through as a so-called, whiplash injury of the muscles, fascia and ligaments involving the cervical spine and upper thoracic—that is the chest. She does have incidentally a narrowing that has been mentioned between the 5th and 6th cervical and 6th and 7th cervical and 7th cervical and 1st thoracic, and some hypertrophic or osteoarthritic change of the same vertebra and she has not improved as fast as some of them do. We have felt like she would eventually improve but that is just prognosis, a hopeful prognosis.''

This case was heard in the Lower Court on August 17, 1959, at which time Dr. Jones stated that he had seen

Mrs. Daniels on August 6, 1959 and at that time she was having muscle spasms, stating:

"A. The muscle spasm is a continuous spasm, it doesn't come and go, it stays and at the time she has trouble, then when she gets relief, it would relieve some, we would give her relaxing drugs to relieve that.

"Q. 19 Did you state you had to use narcotics? A. I did have to use narcotics on her her, according to the record, on August 6, just a few days ago."

Dr. Jones gave a further summation of his prognosis in the last two questions on direct examination, when he was asked and answered:

"Q. 31 Doctor, what is your prognosis, what is your prediction, based on your experience as a physician and surgeon for 31 years, as to what her future disability will be? A. Estimated that she should improve some over a period of six or eight months—how much, I don't know. Then she might—after that improvement more or less be slow—my opinion is that she will know that she has had this injury the rest of her life, off and on, especially if she, in other words, she would be easier hurt, jerked and get some return symptoms to remind her that her neck had been hurt before.

"Q. 32 How long a period, you say long as she lives? A. Yes."

While Mrs. Daniels gave a detailed statement, as did Drs. Barnett and Jones, of the treatment prescribed and how she was treated; how she suffered, how she felt; that she had to procure help with her housework; that

she entered the hospital on February 28th and came out on March 27th, we think she gave a reasonable explanation of why she waited so long to be hospitalized, as well as a reasonable description of her pain. She was asked:

"Q. Do you know, or could you tell the jury why you waited from the time of December the 20th until February to go to the hospital?

(She started to answer, was instructed to speak louder, and answered:)

"A. I said some people may be inclined or want to be going to the doctor every few minutes or go to the hospital every few minutes, but it was right at Christmas and my children, that is one of the things that they count on big is Christmas. Well, I just made myself stay home because I didn't want to spoil their Christmas. Well, I was up and down out of my own bed and I would keep thinking well, this pain is going to go away, it just, but it just never did and it never has."

As to how she suffered, she said:

"A. Well, I have a terriffic hurting all back in here into my neck and it goes down and all this shoulder and even to a spot back in here in my back, which—it was just numb, they had to keep chemical heat on that and they said it was very hot and they were always saying something to me, they were afraid it would burn me if they put it on there—they didn't stress the fact too much, they just mentioned it casually, but I never felt that until five days before I went home and when I did, I just screamed, and I just, you

have seen those places on some peoples' legs that stand too close to the fire place, what it makes them look like, I have that spot on my back from that, and it goes on into my hand and arm and from here over it just, well, I just don't have the use of that arm at all, and I have some of the awfullest headaches anybody ever had, and I never am free of pain; I have not been free of pain, I am not free of pain right now.''

 With the foregoing testimony before him, that part of the Court's charge complained of in Assignment III is as follows:

''Mrs. Daniels would be entitled to an amount that you say would fairly compensate her for her injuries which were inflicted upon her as the direct and proximate result of the negligence of the defendant or that you say would fairly compensate her for any aggravation of her injuries beyond the normal repair thereof as the direct and proximate result of the negligence of the defendant. To do this, you may take into consideration the nature and extent of her injuries, or the nature and extent of her injuries due to the aggravation, their kind and duration, and the amount of mental and physical pain that the plaintiff has suffered, if any, by virtue of her injuries, or by virtue of such aggravation, the cardinal rule being that you should fairly determine what would be just and fair compensation for her injuries, or any aggravated injuries, taking into consideration these different elements.''

We think that the Court was well warranted, based upon the quality of the evidence from the two physicians,

in giving that part of his charge to the jury. We are unable to see how such a charge, based upon the referred to evidence, constitutes permission for the jury to unduly speculate as to the duration of Mrs. Daniels' injuries. There is always some element of speculation prevalent, even in the testimony of experts. The jury had an opportunity to determine what injuries were the result of any aggravation of any condition that existed prior to the injuries sued for, and we see nothing in the statement that indicates that the jury could have labored under the apprehension that the Court was of the opinion that Mrs. Daniels was permanently injured. While it is true that the Court did state to the jury that any amount fixed by them in damages should "fairly compensate her for any aggravation of her injuries beyond the normal repair thereof", etc., he made no specific statement that he thought she was permanently injured.

We agree with learned counsel for defendant, who has prepared an excellent and illuminating brief in support of his assignments of error, that a verdict should never be based alone upon a conjecture, guess, speculation or mere possibility, and that to do so would be error. However, it is not necessary that the evidence show conclusively or without a shadow of doubt that the injuries are permanent. Absolute certainty is not required. Am. Jur., Damages, Vol. 15, Sec. 75, p. 486.

While the jury may have found in their own minds that Mrs. Daniels had a permanent injury, we cannot affirmatively say they did so; but if they did, there is competent evidence in the record from which an inference arises that she was permanently injured, based on the statements of both Drs. Barnett and Jones, her physicians.

Defendant took the deposition of Dr. Nicholas Gotten, an eminent, qualified neurosurgeon, who testified that he examined Mrs. Daniels on August 5, 1959, made an examination, sent her to a radiologist, had X-rays made, had their report, did not see the X-rays himself, but based upon his examination and the report of the radiologist, his testimony is in conflict with that of Dr. Barnett and Dr. Jones. Even if it is, however, the jury had a right to accept the testimony which it believed to be correct, and as in all cases where witnesses, lay or expert, testify in a contradictory fashion of each other, the weight to be given their testimony is a question for the jury, and if the jury believes that the Doctors who had the patient under their care and treatment soon after the injury was inflicted gave a more reasonable explanation and diagnosis of her injuries and prognosis than did Dr. Gotten who only saw her the one time on August 5, 1959, it is not for this Court to say that the jury was wrong in its weight of the testimony of the respective experts.

The Court permitted Dr. Gotten, over the objection of counsel for plaintiff, to be asked and to answer as follows:

"Q. Do you have any opinion as to whether or not the conclusion of the lawsuit will have anything to do with the speed at which she will improve?

"Mr. Utley: I object to the question.

"A. Yes, I think it will help. I'm not saying that she will immediately, upon the conclusion of the lawsuit, get rid of her symptoms, but I think this was a moderately severe cervical strain, and whether she will have any residual symptoms, I cannot say. However, I believe the resolution of the lawsuit will be of

some benefit. I found upon my investigation of similar cases, that it usually is beneficial.

"Mr. Utley: I object to the last question and answer.

"Court: Go ahead."

We conclude, therefore, that Assignments of Error I, II and III should be and are overruled.

With reference to Assignment of Error III, it should be further said that after the general charge had been given, defendant seasonably presented to the Court two special requests, which the Court charged. When these special requests were presented, the Court said with respect to defendant's special request # 1:

"Court: I charge(d) you gentlemen, on aggravation of injuries, which I suppose I am correct, technically incorrect in doing, since it isn't included in the declaration; I charge both of these special requests:

"Plaintiff Mrs. Daniels has not claimed in this suit in her declaration filed any right to recover compensation for aggravation of a pre-existing injury or condition; that is, a condition which was in existence at the time of the accident which is the subject of this lawsuit.

"In arriving at the amount of your verdict you may consider only such injuries to Mrs. Daniels as have proximately, directly, and actually resulted from the accident. Injuries resulting from any other cause cannot be the basis of an award of damages to Mrs. Daniels. Since Mrs. Daniels has not claimed

damages for an aggravation of pre-existing injuries, in fixing her damages you may not consider as a part of same any injuries or conditions from which she may have been suffering at the time of the accident or any aggravation of the same."

With respect to defendant's special request #2, the Court said:

"Court: I charge you as a matter of law that the amount awarded to the plaintiffs by your verdict is no income to the plaintiffs within the meaning of the Federal tax law, so that it is not subject to Federal income tax."

I have shown the foregoing special requests in this Opinion so that the record may indicate how eminently fair the Trial Court was to the defendant when these special requests were given in connection with his whole Charge. We think he would not have erred had he refused to charge either of them.

Passing now to Assignment of Error IV, learned counsel for defendant in attacking the Charge of the Court, as it relates to consortium, which counsel says was "overly detailed and too emphatic", presents the following argument:

"In a case where liability has been admitted, we submit that it is unduly emphatic of the right to recover for loss of consortium to go into a detailed history and quote from Prosser, as the trial judge did in the instant case (Tr. 112). We concede it would have been proper to state the elements of the right of consortium, but going further, as did the trial judge, was prejudicial to the rights of defendant."

In support of this Assignment, counsel for defendant cites the following cases: Carman v. Huff, 32 Tenn. App. 687, 227 S. W. (2d) 780; Gulf Compress Co. v. Insurance Co. of Penn., 129 Tenn. 586, 167 S. W. 859; Stevens v. Moore, 24 Tenn. App. 61, 139 S. W. (2d) 710.

We think it proper to copy into this Opinion that part of the Charge of the learned Trial Court which deals with this question of consortium. In that connection, the Court said:

"If you find, or rather, the plaintiff, Chester Daniels, would be entitled to an amount that you say would fairly compensate him or reimburse him for any amount that he has paid or contracted to pay for doctors' bills, nurses and hospital bills, and any other expenses rendered necessary to relieve his wife of her injuries. In addition, he would be entitled to an amount which you say would fairly compensate him for his loss of consortium.

"Mr. Prosser, a very eminent authority in the field of tort law, has this to say about consortium:

" 'The husband's interest in his relation with his wife first received recognition as a matter of her services to him as a servant. Over a period of some centuries it took form as something considerably broader than this, which was given the name "consortium".'

" 'Consortium may be said to make up a bundle of legal rights, consisting of the trio of services, society and sexual intercourse of the wife. To these elements, the modern law has added the fourth, that is, conjugal affections. The rights of the husband

extend to all four, and while it is seldom that the defendant's conduct interferes with only one of them, it now seems clear in nearly all jurisdictions that such interference with any one will be sufficient as a foundation for the action. The loss of services, while essential at the beginning, is no longer indispensable, and is only one element upon which the action may be based'.

"So, Mr. Daniels would be entitled to an amount that you say would fairly and justly compensate him for his loss of consortium."

We may say that this Assignment is perhaps the most serious of any of the alleged errors. It is true, however, that the Court should have given the jurors to understand the elements embraced in this word "consortium", because it has come to embrace, as understood by our modern day society, elements that were not considered proper under the common law.

In 26 Am. Jur., p. 635, Sec. 7, under the general title "Husband and Wife", and subheading of "Particular Rights and Duties", it is said:

"Particular rights of consortium are bound together in social and legal contemplation, and in the law's expression of them; the law is not solicitous to distinguish among and separate them in suits on torts by outsiders against consortium. These rights of consortium have been defined to include the rights to the person, affection, society, and assistance of one's spouse, and the terms 'service', 'aid', 'fellowship', 'companionship', 'company', 'co - operation' and 'comfort' have also been employed in defining

those mutual and special rights growing out of the marriage covenant."

Then on p. 637, Sec. 9, under the same general heading, and subheading "Rights of Husband and Duties of Wife", the author says:

"Consortium includes the husband's right to the services of his wife as a wife, and this involves her duties to be his helpmeet, to love and care for him in such role, to afford him her society and her person, to protect and care for him in sickness, and to labor faithfully to advance his interests. Consortium includes the performance by a wife of her household and domestic duties, in the sense of whatever is necessary in such respect according to their station in life, without compensation therefor."

Mr. Daniels also sued for and was entitled to recover, under the pleadings, physicians' expenses, hospital and medical expenses of every character in connection with the equipment used in the treatment of Mrs. Daniels. The itemized expenses are properly and carefully set out in the record and in the brief of defendant, as follows:

| | |
|---|---:|
| Dr. Jones | $279.00 |
| Dr. Barnett | 65.00 |
| Milan Hospital | 476.00 |
| Milan Pharmacy | 12.36 |
| Milan Pharmacy | 51.50 |
| Carter's Pharmacy | 24.19 |
| Another collar | 12.36 |
| Total | $920.41 |

In addition thereto, there was automobile expense of a limited number of trips to Jackson and return from their home in Milan. However, taking the actual out-of-pocket expense set forth above and fully shown by the record, subtracted from the $2,500 verdict in favor of Mr. Daniels, leaves only $1,579.59 for damages which may be said to represent that following from loss of consortium. Even if we were to conclude, which we do not, that the learned Trial Judge overemphasized the meaning of "consortium" as relates to the right of Mr. Daniels to recover on account of the loss thereof, we could not find that such action on the part of the Court affirmatively affected the verdict of the jury. The Court could as well have left off the name of the author and delineated the elements embraced in the word "consortium" as understood in our day, which would have more fully emphasized the rights of plaintiff, Mr. Daniels, than he did simply by reading or quoting what Prof. Prosser had said in his text.

We think that a Trial Judge in suits of the caracter and type under consideration, should define consortium to the jurors and we cannot see where the Trial Judge in this case overemphasized any elements embraced in the term by the choice of the language he used. When a Trial Judge goes to discussing to the ordinary jurors such expressions as "consortium", and the rights, duties and responsibilities growing out of conjugal relationships, we think he should delineate the definite elements embraced within these terms, for lack of proximate negligence by either injured spouse would justify the uninjured spouse in recovering damages therefor, and particularly we think there is no distinction to be made in the kind and type of Charge the Court should give relative to such terms in a

case where defendant admits his proximate negligence and in a case where it is denied, except of course, where the Court is required to charge on the question of remote contributory negligence on the part of plaintiff, which was not present in this case.

We, therefore, feel constrained to overrule, Assignment of Error IV.

 Passing now to Assignments of Error V and VI, which are leveled at the excessiveness of the verdict.

Pain, suffering and mental anguish are elements which the jury must consider. Mrs. Daniels was confined to the hospital for approximately one month. She describes the type of pain she has experienced and the mental anguish under which she has labored. The fact that the Christmas Holidays were so near and her duties to her family having multiplied thereby, increased her mental anguish arising from her injury over that of a normal season or period. Mr. Daniels has detailed some of her actions that indicate the quality of pain and mental anguish which she experienced. The expense incident to her treatment is considerable.

We have said over and over that it is a constitutional right of parties to a suit to have their issues determined by competent jurors and that these jurors are the best judges of the amount which might compensate for injuries, including the elements entering into the same, and that the Trial Judge is the next best authority in determining such proper amount. In this case the issues are not complicated.

We commend the spirit and attitude of defendant and his counsel in admitting liability in the outset of the actual trial and limiting the issues to be determined by

the jury, so that there could be no confusion about these issues. The Trial Judge is the 13th juror and he has approved these verdicts.

It is true that under T. C. A. sec. 27-118, this Court would have a right, if the verdicts had shocked our conscience, or in other words we could not conscientiously approve them, to require remittiturs commensurate with our judgment, or reverse if not made. But we do not feel that this is such a case where that authority should be exercised by this Court. We think the verdicts are substantial and exceedingly sufficient, but we cannot conscientiously say that they are excessive, nor can we find any reason to lay any fraud upon the jury by finding that they were influenced by sympathy, passion or caprice. We are satisfied with the verdict of the jury and the judgment of the Court.

All Assignments of Error are overruled, the judgment of the Lower Court affirmed, with interest thereon from August 24, 1959, the date of which the motion for new trial was overruled, and for costs.

Enter judgment accordingly.

Carney and Bejach, JJ., concur.