IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
September 21, 2004 Session

# PATSY SMITH, AS NEXT OF KIN AND MOTHER OF SHAWN SMITH
## v. STATE OF TENNESSEE

Appeal from the Claims Commission for the Eastern Division
No. 401372     Vance W. Cheek, Jr., Commissioner

No. E2004-0737-COA-R3-CV - FILED MARCH 14, 2005

Shawn Smith died of aspiration of gastric contents while a patient at the University of Tennessee Medical Center. Shawn Smith's mother, Patsy Smith ("Plaintiff"), sued the State of Tennessee ("the State"). The case was transferred to the Claims Commission ("the Commission"). After trial, the Commission entered a judgment for the State holding, *inter alia*, that there was no breach of the standard of care. Plaintiff appeals claiming that the Commission erred in holding there was no breach of the standard of care, that the Commission erred in making certain factual findings, and that the Commission erred in refusing to find that the integrity of the medical record had been compromised. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Claims Commission Affirmed; Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and CHARLES D. SUSANO, JR., J., joined.

Leslie A. Muse and Gary E. Brewer, Morristown, Tennessee, for the Appellant, Patsy Smith, as next of kin and mother of Shawn Smith.

Ronald C. Leadbetter, Associate General Counsel, for the Appellee, State of Tennessee.

## OPINION

## Background

This appeal results from the trial of a complicated medical malpractice lawsuit. Because of the issues raised on appeal, a detailed discussion of the facts as reflected in the record is necessary.

Shawn Smith ("Mr. Smith") was hospitalized in October of 1993 for orthopedic surgery to correct problems that developed as a result of an automobile accident in 1992. This surgery was performed on October 6, 1993 at the University of Tennessee Medical Center ("the Hospital"). Plaintiff stayed at the Hospital with her son during his admission. While recuperating on the orthopedic surgery recovery floor, Mr. Smith aspirated vomitus and died some time during the early morning hours of October 8, 1993. Mr. Smith was twenty-six years old at the time of his death. Plaintiff sued the State. The case was transferred to the Commission and tried in late January and early February of 2004.

Mr. Smith's surgery on October 6th was uneventful and post-surgery, at approximately 6:15 or 6:30 p.m., Mr. Smith was moved to the orthopedic surgery recovery floor. At approximately 3 a.m. on October 7th, Mr. Smith vomited. The evidence at trial showed it is not unusual for a patient to vomit post-surgery. In fact, Mr. Smith's doctor gave post-surgery medication orders for Phenergan to combat nausea in addition to the morphine prescribed for pain. The evidence showed that this is a common combination of drugs prescribed post-surgery. The morphine was administered through a patient controlled analgesia pump, or PCA pump, set with a lock-out to prevent Mr. Smith from utilizing more than the prescribed amount. The Phenergan was prescribed on an as needed basis and had to be administered each time by a nurse. Mr. Smith was given Phenergan after vomiting at 3 a.m. Mr. Smith vomited a second time around 10 a.m. on October 7th and again was given Phenergan.

The post-surgery orders also included an order to "[a]dvance to regular diet." Plaintiff testified at trial that Mr. Smith had no solid food during the day of October 7, 1993, but later admitted she could not remember if he had anything to eat such as Jell-O or applesauce during the day or not. Plaintiff testified that at dinner time on the 7th, Mr. Smith was given a food tray, but did not want to eat what was on the tray. Plaintiff stated that Mr. Smith asked for a cheeseburger. Plaintiff testified that someone on the hospital staff brought Mr. Smith a cheeseburger around 5 or 6 p.m. and he ate most of it. Mr. Smith went to sleep around 8 p.m. Plaintiff testified that she slept in a chair-bed next to Mr. Smith's hospital bed and that she went to sleep around 10 p.m.

Registered Nurse Ronald George Baer ("Nurse Baer") came on duty on October 7th at 7 p.m. and cared for Mr. Smith during the relevant time period involved in this case. Nurse Baer performed an assessment of Mr. Smith at the beginning of his shift. Thereafter, the medical record reflects that at 10 p.m. Nurse Baer made a note that Mr. Smith was resting quietly with no complaints.

At approximately 1 a.m. on October 8th, Mr. Smith again vomited. Plaintiff testified that after Mr. Smith vomited this time she called for the nurse, assisted Nurse Baer in cleaning up Mr. Smith, and asked if Nurse Baer was going to call the doctor. Plaintiff testified that the amount of vomitus was large and explained "we changed the sheets, washed him up, put a clean gown on him . . . ." Plaintiff testified that she then cleaned up the vomitus that had dripped on the floor. Plaintiff testified that Nurse Baer told her there was no need to call the doctor and that Mr. Smith would be all right. Plaintiff testified that Nurse Baer gave Mr. Smith a shot of Phenergan around 1:30 a.m. and some Sprite. Plaintiff spoke to Mr. Smith briefly after he was cleaned up and testified "[h]e acted like he felt better." Mr. Smith then went back to sleep. After assuring herself that Mr. Smith was resting comfortably, Plaintiff went back to sleep.

Nurse Baer made an entry in the medical record at 4 a.m. that Mr. Smith was resting quietly and using his PCA morphine pump moderately. The medical record shows Nurse Baer recorded that by 1 a.m. on October 8th, Mr. Smith had used 27.2 milligrams of morphine, and that between 1 a.m. and 5 a.m. he had used 5.1 milligrams of morphine. Plaintiff testified she woke again around 4 a.m. and looked at Mr. Smith and it appeared he was sleeping. She stated "[h]is chest was all right. I mean, he was breathing okay." She testified she could see him breathing and did not hear any gagging, coughing, or rasping sounds. In addition, Plaintiff testified she is a light sleeper and she would have heard it if Mr. Smith had gagged or coughed, but she did not hear anything like that.

Plaintiff stated that although she could see nothing wrong she had a feeling something was wrong so she buzzed for the nurse. She testified that when the nurse did not respond, she left the room and went to the nurse's station to find him. Plaintiff testified that while she was out looking for the nurse, a group of nurses and doctors rushed into Mr. Smith's room. They were there when Plaintiff returned to the room and she was escorted out of the room. Plaintiff testified that she was told around 6:30 a.m. that her son had died.

Nurse Baer testified at trial and stated he only remembers two specific instances during his care of Mr. Smith, at 1 a.m. when Mr. Smith vomited and at 5:45 a.m. when Mr. Smith was found to be in respiratory distress. Nurse Baer relied upon the medical chart for the remainder of his testimony. Nurse Baer testified he was not aware that Mr. Smith had been given a hamburger and stated that if this happened it occurred before his shift, which started at 7 p.m. Nurse Baer testified he remembers being called at 1 a.m. when Mr. Smith vomited and that he remembers finding Mr. Smith sitting up in bed and talking at that time. Nurse Baer testified that he and Mr. Smith had a conversation about school while Mr. Smith was being cleaned up. Nurse Baer testified that Mr. Smith never said anything about experiencing pain or nausea at that time. Nurse Baer also testified that he observed no respiratory distress at that time.

Nurse Baer testified it was his determination that Mr. Smith did not aspirate at 1 a.m. because Mr. Smith was holding a normal conversation with him. Nurse Baer stated he could tell if someone aspirated by observing their outward appearance. He explained that if someone aspirated, their color would change, their respiratory status would change, and they would gasp or gag. Nurse

Baer testified that Mr. Smith did not exhibit these signs. Nurse Baer does not remember using a stethoscope at 1 a.m. to listen to Mr. Smith's lungs to check for aspiration. He testified that he uses the stethoscope for initial assessments and thereafter uses it if he thinks there is a need to do so. Nurse Baer did not think there was a need to check Mr. Smith for aspiration at 1 a.m. Nurse Baer also testified that there was no need to call the doctor as Mr. Smith's vomiting had resolved and was not continuous. Instead, Nurse Baer explained, there were long time periods between the vomiting episodes.

Nurse Baer testified that he remembers that at approximately 5:45 a.m., the LPN came out to the nurse's station and told him Mr. Smith was in distress. At that time, Mr. Smith was found unresponsive and a code was called. As part of the CPR process, Mr. Smith was rolled on to his side so a bed board could be placed. When he was rolled over, coffee ground emesis came out of Mr. Smith's mouth.

Nurse Baer was questioned regarding the doctor's orders and entries in the chart. He explained that the order in the chart to advance to regular diet meant Mr. Smith could have anything he wanted. Nurse Baer stated that if he had been required to start with liquids or do a progression, the order would have stated liquid diet then advance to regular. Nurse Baer explained that a patient's vital signs are typically taken by an LPN, who is to notify the nurse of anything unusual. Nurse Baer testified that a respiratory rate of 20, which is what Mr. Smith's respiratory rate was each time it was checked, is normal.

Ruby S. Wiseman, a registered nurse, testified as an expert witness for Plaintiff. Among other things, Ms. Wiseman had criticisms regarding Mr. Smith's having been given a hamburger to eat. She explained that Mr. Smith's doctor gave orders to advance diet as tolerated and that to her, this order:

> means you start them out on clear liquids. If they tolerate that and don't get nauseated or vomit, then you advance them to soft foods like apple sauce, Jello. Jello is usually the cardinal soft food and then advance them on to a soft diet, a regular diet and . . . Very, with very bland items. You don't want to give them anything greasy or spicy or fried.

Ms. Wiseman testified that the record shows Mr. Smith came to the floor after his surgery around 6:15 or 6:30 on October 6th and that there is no note from that time until 7 p.m. on October 7th showing Mr. Smith received any sustenance or that he was tolerating anything. A notation in the medical record with the 7 p.m. assessment on October 7th stated that Mr. Smith was tolerating liquids, but, Ms. Wiseman testified, that was the only note in the chart regarding diet. There is no mention in the medical record that Mr. Smith ever received a hamburger and fries. However, Plaintiff did testify that her son received a cheeseburger and ate most of it.

Ms. Wiseman testified that the general practice would be to note that the patient was tolerating liquids, or was given Jello or applesauce without nausea or vomiting so the nursing staff

on the next shift would know. Ms. Wiseman stated that giving Mr. Smith a hamburger and french fries was not in keeping with the doctor's orders because it was "approximately four hours after the last bout of vomiting." Ms. Wiseman stated that Mr. Smith never should have been given a hamburger "[b]ecause every time a patient vomits, you've got to go back to Step 1, clear liquids." However, Ms. Wiseman admitted there is no written guideline to look at to determine how many hours should pass between a vomiting episode, the giving of liquid, the giving of soft food, and the giving of regular food. Rather, this is a judgment call and the judgment of the nurse is based in part on interaction with the patient and how the patient reports feeling.

Ms. Wiseman was also critical regarding the nursing assessments of Mr. Smith. The doctor had written an order to do an assessment every four hours for 72 hours. Ms. Wiseman stated there was no assessment done after the 3 a.m. or 10 a.m. vomiting episodes on October 7th. Ms. Wiseman stated:

> I would have gone in, I would have talked to the patient. I would have assessed his lungs sounds. I would have assessed his bowel sounds. I would have asked, if there was anybody in the room I would have asked them if he had eaten anything, because sometimes well meaning family members can bring things in that the nursing staff have no idea about and then you have to be aware of that.

Ms. Wiseman also stated she would assess the lungs and bowels using a stethoscope. However, she admitted there is no written standard of care that says you have to use a stethoscope every time a patient vomits. Ms. Wiseman stated a nurse should have checked on Mr. Smith at least hourly. She stated she would have done this and she bases this assertion on her own experience. Notations in the medical record show that Nurse Baer made rounds at least every other hour.

Ms. Wiseman was critical of what she referred to as "sketchy" charting and stated, "[i]f it's not documented, it wasn't done." Ms. Wiseman did acknowledge, however, that the practice on the orthopedic surgery recovery floor at the Hospital at that time was to chart by exception, which means that only things out of the ordinary needed to be noted.

The medical record shows that Mr. Smith's vital signs were taken, including his temperature, pulse, and blood pressure, with some regularity. Mr. Smith's doctor had ordered that his vital signs were to be taken every four hours. The medical record shows this was done except for one instance when the vital signs should have been taken at 4 p.m. on October 7th and were not.

Ms. Wiseman admitted that the medical record shows Mr. Smith's vital signs were taken at 4 a.m. on October 8th, after the 1 a.m. vomiting episode at issue in this case and before Mr. Smith was found unresponsive at 5:45 a.m. Ms. Wiseman acknowledged that the readings of Mr. Smith's temperature, pulse, respiratory rate, and blood pressure as recorded were normal and show no indication that Mr. Smith was in distress of any sort at that time. The readings of Mr. Smith's respiratory rate did not change throughout his hospitalization, up to, and including, the reading taken at 4 a.m. on October 8th, shortly before his death. Victoria Henson, ("Ms. Henson"), is the LPN who

allegedly made various entries, including the vital signs, in Mr. Smith's chart during the time period after 1:00 a.m. and prior to Mr. Smith being found unresponsive at 5:45 a.m. The State did not have Ms. Henson testify at trial. Neither did Plaintiff.

Ms. Wiseman stated that she believes Mr. Smith's death was preventable. She stated that the nurses should have "upped the assessments. They should have raised the head of his bed. They should have taken him back to clear liquids . . . ."

Cleland Blake, M.D., F.C.A.P., who stated his work is almost totally forensic pathology, testified as an expert witness for Plaintiff. Dr. Blake testified that the cause of death stated in the autopsy was aspiration asphyxia, which means Mr. Smith vomited then aspirated vomitus that went into his trachea bronchial tree and caused the presence of fluid filling in the lungs and plugging the bronchioles. Dr. Blake explained that the acid from the stomach causes a "burning irritation injury of the bronchial passages."

Dr. Blake testified that neutrophils, a sign of inflammatory insult, were present in the lungs upon autopsy and that this is abnormal. He explained that neutrophils would be caused by "[s]ome element of injury, whether it is chemical, meaning acid particulate, aspiration, food particles. Some extrinsic toxins or bacteria which causes a, a purulent substantive reaction which we know as empyema, pus in the lungs or chest cavity, or acute bronchial pneumonia." Dr. Blake believes the neutrophils were caused by aspiration of gastric contents. He stated that neutrophils would begin to be seen in twenty to thirty minutes after injury.

Dr. Blake also testified regarding the medications Mr. Smith was given. He explained that morphine is a central nervous system suppressant used as a pain killer and that Phenergan is used to control nausea. Dr. Blake stated that when used together, these two drugs have a potentiating effect, which means that the Phenergan exaggerates the effect of the morphine causing more of a central nervous system suppression.

Dr. Blake opined that Mr. Smith took vomitus into his lungs after the 1 a.m. vomiting episode and that this began the gradual compromise of the lungs. He opined that the process that caused Mr. Smith's death happened in response to the 1 a.m. vomiting episode. In support of his theory, Dr. Blake stated it is his understanding that Mr. Smith's respiratory rate went up and that he had breathing difficulties and tacycardia after the 1 a.m. vomit. Dr. Blake stated that Mr. Smith would have had difficulty breathing after the 1 one a.m. vomit and his respiratory rate would have gone up to compensate. Dr. Blake testified that a patient who aspirates would have immediate knowledge of it as they would experience a burning sensation and their chest muscles would struggle to get air in. Dr. Blake further opined that by 4 a.m. Mr. Smith was unconscious and would have had a weak pulse. Dr. Blake admitted that he did not see the vital signs in the medical record, but that if Mr. Smith's vital signs were taken at 4 a.m. and were the same as they had been, that would most likely indicate that his condition was good.

According to the medical record, Mr. Smith's vital signs were taken at 4 a.m. and were the same as they had been. In addition, Plaintiff's testimony regarding Mr. Smith's condition belies Dr. Blake's opinion that Mr. Smith aspirated as a result of the 1 a.m. vomiting episode. Plaintiff testified she spoke to Mr. Smith briefly after the 1 a.m. vomiting episode and testified "[h]e acted like he felt better." She also testified that Mr. Smith went back to sleep and that at 4 a.m. she observed "[h]is chest was all right. I mean, he was breathing okay." She testified she could see Mr. Smith breathing and never heard any gagging, coughing, or rasping sounds.

Terri Allison Donaldson, a licensed nurse practitioner, testified as an expert witness for the State and opined there was no breach of the standard of care related to nursing. Ms. Donaldson stated there are no hard rules regarding how many hours to wait before giving liquid then soft food then regular food. She stated that since Mr. Smith "had gone through the, the mid-day and afternoon without any episodes of nausea and vomiting . . ." and had not vomited since 10 a.m., it was not inappropriate or below the standard of care to give him a hamburger.

Ms. Donaldson testified she believes there is no evidence in the medical record showing that Mr. Smith aspirated vomitus after his 1 a.m. vomiting episode. Ms. Donaldson explained that usually when someone aspirates vomitus they cough or sputter, unless they immediately lose consciousness. Ms. Donaldson also stated that if Mr. Smith had aspirated, she would expect that his respiratory rate would have gone up, his blood pressure might have changed, and his heart rate may have increased. None of these things happened. Ms. Donaldson testified that nothing about the vital signs taken at 4 a.m. indicates Mr. Smith had a respiratory problem prior to that time. In addition, Ms. Donaldson testified there is nothing in the record to suggest that Mr. Smith's gag reflex was suppressed, he was unconscious, or that he was unable to recognize any respiratory problems he may have been experiencing. Ms. Donaldson opined it was not beneath the standard of care for a nurse to choose not to use a stethoscope after Mr. Smith's 1 a.m. vomiting episode. Furthermore, Ms. Donaldson testified there is no indication that the combination of morphine and Phenergan affected Mr. Smith's vital signs, which remained stable during his hospitalization.

Dr. Paul Bunton Googe, who specializes in skin pathology and surgical pathology, testified at trial that he was in charge of Mr. Smith's autopsy. Dr. Googe concluded that Mr. Smith died of aspiration of gastric contents. Dr Googe testified it is his opinion, and the opinion of the other physicians involved in the autopsy, that Mr. Smith died of acute gastric aspiration into the lungs in "a matter of minutes or probably not more than an hour from when he died." Dr. Googe testified he does not believe that an event at 1 a.m. caused the death. Rather, Dr. Googe believes the aspirations that led to death occurred "sometime in the ten to twenty minutes before 5:45 a.m."

Dr. Googe explained that the neutrophils could have been present either from traveling with the vomitus or from the blood vessels in the lung and stated "to see neutrophils in response to injury coming from the blood stream, it's usually a matter of hours, four, six, eight hours or longer." He stated there were "just a few tiny areas of neutrophils . . . I don't believe they are sufficient to have caused symptoms and certainly [were] not sufficient to cause death."

The record on appeal shows that the medical record in this case apparently was lost by the Hospital for approximately five years before it finally was produced to Plaintiff. No adequate explanation appears in the record as to where the medical record was during this time period or why it was not produced sooner. In addition, for a variety of reasons having nothing to do with the Commission that eventually heard the case, the case took approximately ten years from the filing of the Complaint until the time of trial. The case was tried in late January and early February of 2004.

The Commission entered a judgment on February 26, 2004. In its memorandum order incorporated into the judgment, the Commission made specific findings of fact and conclusions of law. The Commission found Plaintiff to be "a very honest witness, a very credible witness . . . honest to the point where her testimony became damaging to her claim" and stated "much of this Commission's decision is based upon her testimony . . . ." The Commission also found Ms. Wiseman to be a credible witness but found that many of Ms. Wiseman's criticisms regarding the nursing care admittedly were related to judgment calls. In addition, the Commission found that the deviations Ms. Wiseman claims occurred, specifically the failures to properly advance diet, to adequately maintain the medical chart, and to properly follow physician's orders, were not a direct and proximate cause of Mr. Smith's death. Rather, the Commission found that:

> The body of evidence presented at trial and contained in the entire record proves by a preponderance of the evidence that [Mr. Smith] aspirated on his own vomitus quickly and quietly, so quickly and so quietly, in fact, that it would have taken a nurse providing [Mr. Smith] with a level of care akin to a critical care patient in order to have any remote possibility of catching the aspiration and saving [Mr. Smith's] life.

The Commission found that the nursing techniques testified to by Ms. Wiseman did not establish "the standard of care that was required of a registered nurse on a general orthopaedic recovery floor at UT Hospital."

Further, although the Commission found Dr. Blake to be a credible witness, it found that Dr. Blake's testimony was not supported by the facts. Dr. Blake opined that Mr. Smith aspirated after the 1 a.m. vomit and that he would have begun to have noticeable problems immediately. The medical record and the testimony of the two witnesses, including the Plaintiff, who observed Mr. Smith after the 1 a.m. vomiting episode show, however, that Mr. Smith was not experiencing any respiratory problems at that time and, in fact, he stated he felt better. The Commission stated:

> Dr. Blake testified beyond a reasonable degree of medical certainty that the failure of [Nurse] Baer to listen to [Mr. Smith's] lungs was, in essence, the sole, direct and approximate (sic) cause of [Mr. Smith's] death. As was Ms. Wiseman's testimony, this opinion is not consistent with the entire body of evidence presented at trial and the record as a whole. Specifically, the reaction of [Mr. Smith] after the vomiting episode would not cause a reasonable healthcare professional to take the drastic

-8-

measures that Dr. Blake suggests, which is suctioning [Mr. Smith's] lungs or obtaining a new airway via a tracheotomy. Although Dr. Blake testifies that suctioning is necessary in accordance with the standard of care, the Commission finds under the facts of the circumstances presented that such action was not necessary and did not equate to standard of care.

In contrast to its credibility determinations regarding the other witnesses, the Commission found Nurse Baer to be a horrible, evasive, and elusive witness. The Commission, however, also stated that while there may have been some inadequacies in the care he rendered to Mr. Smith, "there is no evidence that such shortfalls were the direct and proximate cause of [Mr. Smith's] death by aspiration." Although the Commission found Nurse Baer's testimony not to be credible, it noted that it still found that there was a conversation between Mr. Smith and Nurse Baer after the 1 a.m. vomiting episode and that Mr. Smith exhibited no signs of distress whatsoever at that time because Plaintiff, who was a credible witness, also testified to these facts. The Commission stated "there is no evidence that the standard of care dictated [Nurse] Baer to have acted differently."

The Commission also found Dr. Googe's testimony to be credible and stated:

He conducted the autopsy on [Mr. Smith]. He stated without reservation that (1) vegetable matter was found deep in the lungs of [Mr. Smith]. This is a medical finding of a previous aspiration occurring some time prior to [Mr. Smith's] hospitalization on October 6th, 1993. Secondly, the neutrophils in [Mr. Smith's] lungs appeared to have come from such prior aspiration. Thirdly, [Mr. Smith] died of acute aspiration of gastric contents into the lungs, and finally, the aspiration that caused [Mr. Smith's] death occurred less than one hour prior to the death. Dr. Googe stated that there's no credible evidence to prove Dr. Blake's theory that [Mr. Smith] aspirated at 1:00 A.M. and slowly suffocated as his lungs shut down and filled up with fluid.

The Commission found that Dr. Blake's testimony and his opinion that Mr. Smith aspirated as a result of the 1 a.m. vomit also were rebutted by the fact that Mr. Smith did not choke, cough, or complain of any burning in his lungs after the 1 a.m. vomit; that Mr. Smith carried on conversations with his mother and with Nurse Baer after the 1 a.m. vomit; that the anesthesiologist trying to intubate Mr. Smith during the code found secretions in Mr. Smith's throat, mouth, and upper airways; and that coffee ground emesis was found in Mr. Smith's mouth during the code. The Commission stated that these facts show, and the Commission so found, "that a final vomiting episode took place an hour prior to [Mr. Smith's] death, somewhere around 5:00 o'clock, 5:15 or the like" and stated that this theory is more logical than Dr. Blake's theory. The Commission found that "Dr. Googe's testimony fit the factual circumstance by a preponderance of the evidence."

The Commission stated it would have liked to have heard from the doctor who performed the surgery on the issue of whether Mr. Smith suffered a suppressed gag reflex. Several witnesses at trial testified to the potentiating effect of morphine and Phenergan. However, the

Commission stated "[i]f allegedly there was a problem with a suppressed gag reflex due to over medication . . . then we have to look to the fault going back - - the genesis of that fault being the original doctor order . . . ordering the Phenergan and the morphine combined and the dosage that he assigned to each drug." There is no evidence that the nursing staff failed to give medications in accordance with the doctor's orders.

The Commission further noted that it would have liked to have heard testimony from "Victoria Henson, the LPN who supposedly checked and charted Mr. Smith's vital signs during the critical period of time." The Commission made the finding that the State did not offer Ms. Henson's testimony, but declined to make any further findings regarding this issue.

The Commission also addressed the issues surrounding the lost chart stating:

The chart in this case was lost for five and a half years. There's absolutely positively no way this Commission can find anything but that such an act, if you will, such an occurrence is unacceptable. There is no proof that the integrity of this chart was maintained. However, there is also no proof that this chart was altered. The [Plaintiff] made it out for an inference to be drawn that it could have happened. The Commission acknowledges that it could have happened. The Commission finds that there is no evidence supporting that it happened. That having been said, this Commission cannot let it go by without stating that the hospital's failure to find the file for five and a half years is an abomination, and we would hope that such an event would not be repeated. . . . There was an inference laid before the Commission, which the Commission respects, for the Commission to make of it as it would. And I find that while the integrity of the chart was not proven, that alteration was not proven either. So, in essence, it's a wash.

The Commission entered judgment in favor of the State.

**Discussion**

Although not stated exactly as such, Plaintiff raises three issues on appeal: 1) whether the Commission erred in refusing to find that the integrity of the medical record had been compromised; 2) whether the evidence preponderates against the Commission's factual findings; and, 3) whether the evidence preponderates against the Commission's holding that there was no deviation from the standard of care.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, here the Commission, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

We first will discuss whether the Commission erred in refusing to find that the integrity of the medical record had been compromised. Plaintiff argues that she should have received a presumption that the medical record was altered. Plaintiff's argument rests upon the doctrine of spoliation of evidence, which "permits a court to draw a negative inference against a party that has intentionally, and for an improper purpose, destroyed, mutilated, lost, altered, or concealed evidence." *Leatherwood v. Wadley*, 121 S.W.3d 682, 703 (Tenn. Ct. App. 2003).

To begin, we note that the record in this case is devoid of evidence showing that the medical record was destroyed, mutilated, or altered. There is evidence in the record, however, showing that the medical record was lost and not produced for a period of approximately five years before being produced by the Hospital. More importantly, however, the record is devoid of evidence showing that the Hospital "intentionally, and for an improper purpose" lost or concealed the medical record during this time period. *Id*. The medical record eventually was produced and was made available to Plaintiff and, as the Commission noted, Plaintiff relied on the medical record at trial. As there is nothing in the record showing the intent necessary to support an inference under the doctrine of spoliation of evidence, Plaintiff was not entitled to such an inference.

The Commission, however, did state:

There is no proof that the integrity of this chart was maintained. However, there is also no proof that this chart was altered. The [Plaintiff] made it out for an inference to be drawn that it could have happened. The Commission acknowledges that it could have happened. The Commission finds that there is no evidence supporting that it happened. That having been said, this Commission cannot let it go by without stating that the hospital's failure to find the file for five and a half years is an abomination, and we would hope that such an event would not be repeated. . . . There was an inference laid before the Commission, which the Commission respects, for the Commission to make of it as it would. And I find that while the integrity of the chart was not proven, that alteration was not proven either. So, in essence, it's a wash.

Plaintiff argues that she need not prove alteration in order to impeach the medical record and cites to *Richardson v. Miller*, which states that "[s]eldom will parties be able to prove that their adversary maliciously destroyed or secreted a missing document." *Richardson v. Miller*, 44 S.W.3d 1, 28 (Tenn. Ct. App. 2000). *Richardson*, however, dealt with allegations regarding a specific allegedly missing document and stated that a factual issue "is created when the party seeking the missing evidence instruction puts on evidence showing (1) that the document exists, (2) that the document is relevant, and (3) that the opposing party had exclusive control of the document and the party possessing the document proffers an explanation for not producing it. *Id*. In the instant case, there are no allegations regarding a specific missing document or documents. Plaintiff did not show that any specific document existed and was not produced at or before trial. Plaintiff apparently argues that the five year delay in producing the medical record is equivalent to having maliciously destroyed or totally failed to produce the record. Plaintiff then argues that because of this delay, an

alteration of the record by the Hospital should be presumed. We fail to see any correlation between a delay, even an unreasonable five year delay, in producing the medical record and a claim of alteration of the medical record. There has been no reason presented as to why the Hospital or any individual allegedly wanting to alter the medical record would have required a five year period in which to make the claimed alteration. In short, the fact that the State or the Hospital unreasonably delayed for five years the production of the medical record does not necessarily mean that the medical record was altered in any way. The record on appeal presented to us does not show any causal relationship between the delay, even an unreasonable five year delay, in producing the medical record and the claimed alteration to that medical record, and we find no reason to believe that such a causal relationship automatically exists. Therefore, Plaintiff's reliance upon *Richardson* is misplaced.

Additionally, we note that Plaintiff did not bring the matter of the missing medical record to the attention of the Commission until after the State had been granted an Order of Dismissal for failure to prosecute two years after the filing of suit. Plaintiff filed a Motion to Reconsider and the Commission did enter an Order Setting Aside Order of Dismissal. However, the only relief requested by Plaintiff was to have the Order of Dismissal set aside. Plaintiff did not ask for any other relief at that time. Plaintiff did not seek any relief relative to the once missing medical record until trial and, as the Commission noted, Plaintiff relied upon the medical record at trial. We are unpersuaded by the Plaintiff's argument that, basically, those portions of the medical record that are helpful to Plaintiff's case are reliable and those portions of the medical record that are harmful to Plaintiff's are unreliable.

The Commission did acknowledge that an inference had been laid before it, whether Plaintiff was entitled to one or not, and clearly considered the matter. We hold the Commission did not err in refusing to find that the integrity of the medical record had been compromised as no alteration of the medical record either was proven or properly presumed to have occurred.

We next consider, in light of our discussion above, whether the evidence preponderates against the Commission's factual findings. "When a trial court has seen and heard witnesses, especially where issues of credibility and weight of oral testimony are involved, considerable deference must be accorded to the trial court's factual findings." *Seals v. England/Corsair Upholstery Mfg. Co.*, 984 S.W.2d 912, 915 (Tenn. 1999) (quoting *Collins v. Howmet Corp.*, 970 S.W.2d 941, 943 (Tenn.1998)).

Plaintiff claims the evidence preponderates against the Commission's factual findings because the medical record was unauthenticated and uncorroborated; Nurse Baer's testimony was found to be elusive, evasive, and not credible; the State did not offer the testimony of Ms. Henson, the LPN; and the State's experts relied upon the medical record to opine that there were no deviations below the standard of care. This argument breaks down into several main points.

First, Plaintiff complains about the medical record, which she asserts should not have been relied upon because it was not produced for approximately five years. Plaintiff again cites to

*Richardson* in support of her contention. *Richardson*, 44 S.W.3d 1. As we discussed above, Plaintiff's reliance upon *Richardson* is misplaced. In addition, we note that the Commission's findings and ultimate decision were, in large part, "based upon [Plaintiff's] testimony..." and the testimony of Dr. Googe, testimony which strongly supports the Commission's factual findings even if the medical record itself were discounted. Plaintiff's claim that the testimony of the State's experts should be given no weight because they relied upon the medical record to opine that there were no deviations below the standard of care also must fail given our resolution of Plaintiff's issue concerning the medical record.

Second, it is true that the Commission found Nurse Baer's testimony to be evasive, elusive, and not credible. However, the Commission specifically stated that even if Nurse Baer's testimony were discounted, it could and did still find that there was a conversation between Mr. Smith and Nurse Baer after the 1 a.m. vomiting episode and that Mr. Smith exhibited no signs of distress whatsoever at that time because Plaintiff, who was a credible witness, also testified to these facts.

Finally, Plaintiff argues that because the State did not offer the testimony of Ms. Henson, the LPN, Plaintiff should have been entitled to an inference that the testimony that would have been given by Ms. Henson "would not sustain the contention of [the State]." *Raines v. Shelby Williams Indus.*, 814 S.W.2d 346, 349 (Tenn. 1991) (quoting *Delk v. State*, 590 S.W.2d 435, 448 (Tenn. 1979) (dissenting opinion)). In essence, Plaintiff argues she was entitled to the benefit of the missing witness rule. This Court discussed the missing witness rule in *Dickey v. McCord*, stating:

> The missing witness rule provides that
>
> [f]ailure of a party to call an available witness possessing peculiar knowledge concerning the facts essential to a party's case, direct or rebutting, or to examine such witness as to the facts covered by his special knowledge, especially if the witness would naturally be favorable to the party's contention, relying instead upon the evidence of witnesses less familiar with the matter, gives rise to an inference that the testimony of such uninterrogated witness would not sustain the contention of the party. No such inference arises where the only object of calling such witness would be to produce corroborative, cumulative, or possibly unnecessary evidence; or when an adverse inference would be improper for any other reason . . . .
>
> *Stevens v. Moore*, 24 Tenn. App. 61, 139 S.W.2d 710, 717 (Tenn. Ct. App. 1940) (citation omitted); *see also State v. Francis*, 669 S.W.2d 85, 88-90 (Tenn. 1984). As a prerequisite to commenting on a missing witness, the evidence must show "that the witness had knowledge of material facts, that a relationship exists between the witness and the party that would naturally incline the witness to favor the party and

that the missing witness was available to the process of the Court for the trial." *Delk v. State*, 590 S.W.2d 435, 440 (Tenn. 1979).

*Dickey v. McCord*, 63 S.W.3d 714, 721 (Tenn. Ct. App. 2001).

It is true that the State did not offer Ms. Henson's testimony. We note, however, that there is absolutely nothing in the record to show that at the time of trial, more than ten years after Mr. Smith's tragic death, Ms. Henson still was employed by the Hospital or that she even still was alive. There is nothing in the record to show that a relationship exists between Ms. Henson and the Hospital that would incline Ms. Henson to favor the Hospital. It may be that Ms. Henson still works for the Hospital, or it may just as likely be that Ms. Henson quit or was fired and maintains some hostility toward the Hospital. There simply is nothing in the record to show that Ms. Henson was uniquely under the State's control or that she was not as equally available to Plaintiff as to the State. In fact, there is nothing in the record to show that Ms. Henson "was available to the process of the Court for the trial." *Id.* For all we know, Ms. Henson may no longer be living, or may no longer be residing within the jurisdiction. We simply have nothing in the record to show the prerequisites that would entitle Plaintiff to the missing witness rule. If Plaintiff wanted to call Ms. Henson as a witness, Plaintiff was as free to do so as was the State. This being so, we find no error by the Commission as to this issue raised by Plaintiff.

In her reply brief, Plaintiff also argues that the testimony of Dr. Fulkerson, offered by the State, was not credible and was "not sufficient to support the verdict." We find nothing in the record showing that the Commission relied in any significant way upon the testimony of Dr. Fulkerson in support of its holding. Instead, the Commission held that Plaintiff did not establish the standard of care, and, therefore, failed to establish any breach of the standard of care. In its memorandum opinion, the Commission simply mentions that "[t]he gist of Dr. Fulkerson's testimony was that [Mr. Smith] was not high risk." The Commission then noted:

> [Mr. Smith] was - I hate the term, but it's a medical term - morbidly obese. He was 300 pounds, had gastric reflux disease as well as he had been injured in an accident prior. Dr. Blake testified as to the compressed chest cavity of [Mr. Smith]. He stated that in his opinion [Mr. Smith] was a high risk candidate, . . . .

The Commission observed the witnesses and made very specific credibility determinations and, as we must, we afford considerable deference to the Commission's credibility determinations and the resulting impact of these determinations on the Commission's factual findings. The evidence does not preponderate against the Commission's factual findings and, therefore, we will not disturb those findings upon appeal.

We next consider, given our holdings above, whether the evidence preponderates against the Commission's findings and resulting decision that there was no deviation from the standard of care. Medical malpractice actions in Tennessee, such as this case, are governed by Tenn. Code Ann. § 29-26-115, which provides, in pertinent part:

-14-

(a) In a malpractice action, the claimant shall have the burden of proving by evidence as provided by subsection (b):

(1) The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred;

(2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and

(3) As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.

Tenn. Code Ann. § 29-26-115 (a) (Supp. 2004).

To begin, the Commission found that the nursing techniques testified to by Ms. Wiseman did not establish "the standard of care that was required of a registered nurse on a general orthopaedic recovery floor at UT Hospital." The Commission found Ms. Wiseman's criticisms regarding the nursing care admittedly concerned judgment calls. In addition, the Commission found that the drastic measures of suctioning Mr. Smith's lungs or obtaining a new airway via a tracheotomy after the 1 a.m. vomiting episode that Dr. Blake testified were necessary in accordance with the standard of care were, under the facts and circumstances presented in this case, not reasonable and necessary and did not equate to the standard of care. Thus, the Commission found that Plaintiff did not prove "[t]he recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred . . . ." Tenn. Code Ann. § 29-26-115 (a)(1) (Supp. 2004). The evidence does not preponderate against this finding as previously discussed in this Opinion.

Additionally, the Commission found that the deviations Ms. Wiseman claims occurred, specifically the failure to properly advance diet, to adequately maintain the medical chart, and to properly follow physician's orders, were not a direct and proximate cause of Mr. Smith's death. The Commission stated that "there is no evidence that such shortfalls [on the part of Nurse Baer] were the direct and proximate cause of [Mr. Smith's] death by aspiration." The Commission stated "there is no evidence that the standard of care dictated [Nurse] Baer to have acted differently." In addition, although Dr. Blake opined "beyond a reasonable degree of medical certainty that the failure of [Nurse] Baer to listen to [Mr. Smith's] lungs was, in essence, the sole, direct and approximate (sic) cause of [Mr. Smith's] death", the Commission found that this opinion was not "consistent with the entire body of evidence presented at trial and the record as a whole." Thus, the Commission found that Plaintiff failed to prove "[t]hat the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and . . . [that] [a]s a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which

would not otherwise have occurred." Tenn. Code Ann. § 29-26-115 (a)(2 & 3) (Supp. 2004). For these reasons, and the reasons discussed earlier in this Opinion, the evidence does not preponderate against this finding by the Commission.

Plaintiff then argues that the Commission erred by assigning fault to the doctor who performed the surgery because the Commission stated it would have liked to have heard from this doctor and "[i]f allegedly there was a problem with a suppressed gag reflex due to over medication . . . then we have to look to the fault going back - - the genesis of that fault being the original doctor order . . . ordering the Phenergan and the morphine combined and the dosage that he assigned to each drug." However, the Commission never assigned any fault to this doctor. We find no merit to this issue.

The reality of the situation is that Plaintiff, despite the excellent work of her lawyers, was unable to make the required showings regarding the applicable standard of care and the breach of such standard. The evidence does not preponderate against the Commission's factual findings and, after a thorough review of the record, we hold that the Commission reached the correct conclusions of law. As we find no error by the Commission, we affirm the Commission's grant of judgment to the State.

### Conclusion

The judgment of the Claims Commission is affirmed, and this case is dismissed with this cause being remanded to the Claims Commission solely for collection of the costs below. The costs on appeal are assessed against the Appellant, Patsy Smith, and her surety.

_____
D. MICHAEL SWINEY, JUDGE